9 So.2d 433

**WHITE et al. v. HODGES et al.**

No. 36624.

June 29, 1942.

Rehearing Denied July 20, 1942.

John B. Files, Herold, Cousin & Herold, and Barksdale, Bullock, Clark & Van Hooks, all of Shreveport, Seals & Atkins, of Homer, and Wilkinson, Lewis & Wilkinson, of Shreveport for defendants and appellants.

Robert H. Wimberly, of Arcadia, and Guy Wimberly, Jr., and Ben F. Roberts, both of Shreveport, for plaintiffs and appellees.

HIGGINS, Justice.

The plaintiffs, as owners of one hundred ninety-nine acres of land located in Claiborne Parish, Louisiana, which they acquired by inheritance from their father and mother (E. C. White and Mrs. Addie White) and by subsequent partition among themselves, instituted six slander of title suits against the defendants, alleging that they were slandering the plaintiffs' title by claiming to own a large part of the minerals under this tract of land, by virtue of six mineral deeds and subsequent transfers by the grantees, the last of the mineral servitudes having been granted by the deceased, E. C. White, on April 8, 1925, to the defendant O'Brien Bros., Inc. They prayed that the defendants be ordered and directed to cease slandering their title and that the mineral servitudes be decreed to have been prescribed by ten years liberative prescription, and that they be ordered cancelled from the public records.

The defendants answered, denying the slander and setting up titles to 82.5% of the minerals in themselves, respectively, by the various deeds, thus converting the action into a petitory one. The defendants pleaded that the ten years prescription of nonuse of the mineral servitudes had been interrupted by a joint lease executed on January 15, 1931; and, in the alternative, if this lease did not interrupt prescription, it, by its terms, extended prescription until January 15, 1936, before which date the defendants claimed that another joint lease became effective, extending the prescriptive period until January 15, 1941, on which date the drilling of a well was commenced. The defendants also pleaded that the acceptance of rentals by the plaintiffs under each lease constituted an acknowledgment of the defendants' rights, thereby interrupting prescription. The defendants also interposed, in the alternative, a plea of estoppel, based on the ground that on account of the plaintiffs' acts in executing the lease dated December 18, 1935, they were induced to execute the joint lease which they would not have done otherwise, and that the plaintiffs cannot now change their position by contending that the defendants have lost their mineral rights by prescription and are not entitled to receive the royalties that the plaintiffs agreed should be paid them under the terms of the lease. The defendant O'Brien Bros., Inc., specially pleaded, in the alternative, that when it purchased its interest from plaintiffs' ancestor, E. C. White, he had already sold all the minerals he owned in the particular 40 acre tract in question and that, therefore, prescription did not run against it until the other minerals previously sold had reverted to the plaintiffs, his heirs, and then, in turn, passed to it by operation of law.

After a trial on the merits, the district judge rendered a separate judgment in each case, as prayed for, in favor of the plaintiffs, but did not expressly order the

cancellation of the subsequent transfers of mineral rights. The defendants appealed separately, and the plaintiffs have answered the appeals in the cases bearing the Nos. 16,600, 16,601, 16,602 and 16,603 of the docket of the Second Judicial District Court, asking that the judgments be amended so as to also order the cancellation and erasure of the subsequent mineral deeds from the public records.

The record of the six cases, which were consolidated for trial, shows that the plaintiffs are the sole and only heirs of the late Mr. and Mrs. E. C. White, who owned a 199 acre farm in Claiborne Parish. Prior to the death of E. C. White, in separate transfers, he created six mineral servitudes covering 82.5% of the mineral rights in the land in favor of some of the defendants, the first instrument being dated October 13, 1924, and the last, April 8, 1925. After the death of their father, the plaintiffs and their widowed mother, on January 15, 1931, entered into a mineral lease with the Triangle Drilling Co., Inc., for a primary term of five years, expiring on January 15, 1936, unless the land was drilled by that time. The recited cash consideration was the sum of $2,000. The lease did not contain any clause stating that the landowners intended to interrupt prescription then running against the mineral servitude owners who had also signed the lease. At the time of the execution of this lease there was a pre-existing recorded mortgage in favor of the Federal Land Bank, which primed the rights of all of the mineral servitude owners. There were also nine judgments against some of the landowners, but they were subordinate in rank to the rights of some of the mineral owners, but superior to others. All of the mineral owners, as parties to the lease, agreed that the $2,000 lease or bonus money would be paid by the lessee to liquidate the judgments or judicial mortgages against some of the landowners. They also agreed that the delayed annual rentals of $200 were to be used to pay the yearly installments due the mortgage creditor. This was done.

The defendants contend that, as the plaintiffs accepted the $2,000 bonus or lease money, which went to liquidate obligations that they were not personally liable for, the lease in question, notwithstanding it does not contain any express provision that it was the intention of the landowners to interrupt prescription, had that effect because the only consideration that the mineral owners received for surrendering their 82.5% of the lease money and delayed rental money to the plaintiffs was the extension of their servitudes, and therefore there was more than a mere acknowledgment by the surface owners of the existence of the rights of the mineral owners and definite evidence of intention on the part of the landowners to interrupt the running of prescription.

The plaintiffs argue that as the defendants converted the suit into a petitory action, they became the plaintiffs therein, with the burden of establishing their title to these mineral servitudes, and that they failed to do so, citing McConnell v. Ory et al., 46 La.Ann. 564, 15 So. 424; Cambais et ux. v. Douglas, 167 La. 791, 120

So. 369; Robinson v. Horton et al., 197 La. 919, 2 So.2d 647; Spears v. Nesbitt, 197 La. 931, 2 So.2d 650.

In the case of Achee v. Caillouet, 197 La. 313, 1 So.2d 530, 536, the Court, in its opinion on rehearing, said:

"* * * It is utterly inconsistent and irreconcilable with the firmly established rule that a bare acknowledgment by the landowner of the existence of the mineral rights of another in his land does not interrupt the running of prescription in the sense that the prescription begins to run anew from the date of acknowledgment. To have that effect, the acknowledgment must be coupled with the purpose and intention that it shall have that effect, and such purpose and intention must be expressed in unmistakable terms. * * *

"To hold that Achee's signing the lease contract evidenced a purpose and intention on his part so to interrupt prescription as to cause it to run anew for a full period of 10 years from the date of the lease would be contrary to reason. It was clearly against his interest to prolong the life of the servitude for that length of time. But it was to his interest to extend the remaining period of prescription so as to make the lease effective."

See also Brown et al. v. Sugar Creek Syndicate et al., 195 La. 865, 197 So. 583; Kennedy v. Pelican Well Tool & Supply Co., 188 La. 811, 178 So. 359; and Bremer v. North Central Texas Oil Co., 185 La. 917, 171 So. 75.

When the plaintiffs' attorney attempted to have his clients testify that they had no

intention whatsoever, in entering into the lease jointly with the defendant mineral owners, to acknowledge their rights in any way so as to interrupt prescription running against the mineral servitudes, with a view of starting prescription to thereby run anew, but that it was a simple acknowledgment of the existence of the mineral servitudes granted by their father, the defendants' attorney objected to such testimony. The court first overruled the objection and one of the witnesses answered that she did not intend to interrupt prescription, whereupon the defendants' attorney renewed his objection and the court sustained it.

In explaining why the mineral owners agreed to surrender their rights in the lease money, as well as the delayed rental payments of $200 per year under the lease to liquidate the judgments and the mortgage, L. M. Moffitt, the Secretary-Treasurer of the Triangle Drilling Co., Inc., and the Trinity Royalty Co., Inc., the former being the lessee under the 1931 lease, and the latter, one of the lessors thereunder, testified as a witness for the defendants, as follows:

"A. The Federal Land Bank payment was past due and stood as a threat to the mineral ownership that the mineral owners owned in the property, they were giving their bonus money to take care of the past due payment and to pay off judgments without the payment of which a good lease could not be made, they wanted to guard against the Federal Land Bank payment becoming past due subsequent to the execution of this lease which continued as a

threat to their ownership as well as to the ownership of this lease so the provision was made that out of the $200 rental to be paid each year to keep the lease in force and effect without drilling that $145.00, the amount of the Federal Land Bank payment due each year should be paid to the Federal Land Bank, the balance to be distributed as rental to the lessors."

E. H. Fortson, one of the defendants, a title abstractor of Homer, La., with about twenty years experience, stated that it was his understanding that there was to be a joint lease, which would protect his mineral interests and, therefore, the reason why he gave up his pro rata share of the bonus or lease money and the delayed rentals in order to liquidate the judgments and the mortgage, and when asked "Why did you agree to that?", he answered:

"A. Well I will state it just as definitely as I know how, the United Gas had been a fine customer of ours, I didn't want to block them from getting a lease because I didn't want to sign it and I got the idea too that the Federal Land Bank mortgage might be foreclosed and if it was why that would eliminate my minerals, I thought the best thing for me to do was to go ahead and sign it."

F. F. Meadows, a mineral owner, who signed the 1931 lease, testified that he was willing to divert his part of the bonus money to pay the mortgage of the Federal Land Bank and other indebtedness of some of the landowners, to preserve his mineral rights.

■ The testimony of the defendants' witnesses tends to show that the defendants had in mind extending their mineral rights but they were powerless to do this without the consent of the landowners, who under the law must clearly and definitely state or act in such a way so as to show that it was their intention to interrupt the running of prescription and start it anew. There is no evidence in the record to that effect.

On the contrary, it appears from the record that the mineral owners consented to the surrender of their pro rata share of the lease or bonus money and the delayed rentals for several reasons: (1) The mortgage primed their mineral rights amounting to 82.5% and in the event of foreclosure and sale of the tract of land, these mineral servitudes would be wiped out; (2) the lessee was insisting upon having a lease which would be protected against some of the judgments and against the mortgage creditor foreclosing the mortgage and thereby cancelling the lease, which would be subordinate in rank to some of the judgments and the mortgage; (3) the only way the mineral owners could realize anything on their mineral rights was to have the land leased and drilled; and (4) the mineral owners realized that half of the life of the mineral servitudes had expired by the running of prescription.

■ The trial judge properly held that the mineral owners had failed to show any intention on the part of the landowners in entering into the lease to thereby interrupt prescription.

■ The point made by the defendants that the joint execution by the landowners

and the mineral owners of the oil and gas lease of January 15, 1931, which had a primary term running beyond the date upon which the rights of the mineral owners would otherwise become prescribed, extended the rights of the mineral owners during the entire term of the lease, or until January 15, 1936, is well taken, except as to the plaintiff minors whose rights will be hereafter considered. Robinson v. Horton, supra, and Spears v. Nesbitt, 197 La. 931, 2 So.2d 650.

The defendants next argue that the lease of December 18, 1935, was a joint pooling one between the land and mineral owners, and having been entered into prior to the expiration of the 1931 lease, which expired on January 15, 1936, the rights of the defendant mineral owners were thereby further extended during the entire term of the new lease, and as the lessees had kept it in legal effect by paying the delayed rentals until a well was drilled on January 15, 1941, on the property and oil discovered in paying quantities, their mineral rights remained in existence and they were entitled to their pro rata share of the royalties, under the lease.

The plaintiffs denied that they had entered into a joint pooling lease with the defendant mineral owners on December 18, 1935, averring that unbeknown to them and against their instructions, the lessees' agent, who had close business relations with some of the mineral owners, had pasted riders on the printed lease and glued an additional page at the end of it, subsequent to obtaining the landowners' signatures, and thereafter had all of the mineral owners sign on the added page.

Eight of the eleven plaintiffs testified that they had, upon legal advice, refused to sign a joint or pooling lease with the mineral owners, whose rights were about to prescribe, and that they so informed the agent of the lessees; that they rejected his offer of $5 per acre and signified their willingness to take $10 per acre for a period of five years, which was acceded to by the lessees; that at the time they signed the lease there was nothing in the printed document nor anything attached to it which showed that the mineral owners were to be made parties to it; that the riders to the printed lease reciting the names and the respective proportionate interest of the mineral owners were pasted thereon after the plaintiffs had signed it; and that they had no intention of entering into a joint lease with the mineral owners but had positively instructed the lessees' agent that they would not sign the lease with the mineral owners and that he clearly understood their position.

The testimony of the plaintiffs is corroborated by one disinterested witness and a relative by marriage of the plaintiffs, who had signed as witnesses to their signatures to the lease.

The employee of the lessees, in his testimony, contradicted the above statements contained in the testimony of the plaintiffs and their witnesses, stating that it was the intention of the parties to enter into a joint lease. He admitted that he had the riders, which were subsequently attached to the lease, in his pocket.

The original lease is in the record and it clearly shows that an uninitialed rider giving the names and proportionate interests of the mineral owners was pasted on to the printed form of lease signed by the plaintiffs. It also shows that the extra page was glued on the last page containing the signatures of all of the plaintiffs and that all of the mineral owners signed on this added page. This is just the contrary to the way the lease of January 15, 1931, was signed, because in that instance all of the mineral owners signed before any of the landowners.

The lease of December 18, 1935, in favor of the United Gas Public Service Co., Inc., the Standard Oil Company of Louisiana, and the Sugar Creek Syndicate, Inc., was for a primary term of five years, commencing on January 15, 1936, and for a cash consideration of $1,990 covering the entire tract of land. There was a provision requiring the lessees to pay the lessors $199 per year, as delayed rentals, until such time as drilling operations were started. On December 18, 1935, the lease of January 15, 1931, had twenty-eight more days to run, before it expired by its terms, on January 15, 1936. Therefore, that was the reason why the new lease was to commence from that date. During the twenty-eight day period, it is conceded that there were no drilling operations started by the lessees under the 1931 lease.

On December 18, 1935, a collateral agreement was also executed in order that the bonus money of $1,990 could be paid directly by the lessees to the Federal Land Bank of New Orleans to finally liquidate and pay the balance due on the mortgage on the land covered by the lease. This document contains the following provision: "It is understood and agreed that the authorization herein contained to pay said consideration to the Federal Land Bank of New Orleans is conditioned upon the fact that the said mortgage affects the entire property under examination, including the mineral rights thereunder." This is a typewritten document and nowhere in the body of it is there anything stated as to whom the "undersigned parties" were to be, or what respective interests they had in the property. The document refers to the lease of December 18, 1935, and again all of the landowners' names appear first, followed by all of the mineral owners.

The plaintiffs in their testimony explain that the lessees required this document in order that they (lessees) might pay directly to the mortgage creditor the full balance due on the mortgage and to have it cancelled as a protection of their rights as lessees, because the lease necessarily would be subordinate in rank to the mortgage. They also point out that the agent of the lessees was without authority to permit the mineral owners to sign this document. They explain that the mineral rights referred to in the document were those of the widow and heirs of Dr. Craighead, and that the prescriptive period of ten years, insofar as that mineral servitude was concerned, had not expired. The plaintiffs stated that the mineral right of the Craigheads was still in legal existence, having been granted in 1931, and that this suit does not in any way involve that servitude.

The defendants introduced evidence showing that under the 1935 lease, the lessees paid, in accordance with its terms, $199 each year for delayed rentals, in order to keep the lease alive, and that this money was paid to the land and mineral owners in the respective proportionate shares, as shown by the typewritten rider attached to the printed lease, and that the plaintiffs did not protest.

To offset this proof, the plaintiffs point out that they had not been furnished with a copy of the lease; that the lessees paid the bonus money directly to the Federal Land Bank and had the mortgage cancelled; that there were eleven plaintiffs and because their proportionate share each year of $199 was small, the incorrect pro rata payments, consequently, escaped their attention; that they had no reason to suspect that any part of the delayed rentals were being paid to the mineral owners, because they knew that they had never entered into any agreement or lease with them and, therefore, their failure to collect all of the delayed rentals due them should not be construed as a circumstance indicating that they intended to sign a joint lease with the mineral owners.

In the case of Hightower v. Maritzky, 194 La. 998, 195 So. 518, 522, in considering an almost identical issue, the Court said:

" * * * the plaintiffs—eight in number —all testified on the trial of the case that there was an agreement between them and the lessee, at the time when they signed the leases, that the holders of the one-fourth mineral interest—now the defendants in this suit—would not be allowed to sign the instruments. The plaintiffs in their testimony gave a plausible reason for insisting that the lessee should not allow the holders of the one-fourth mineral interest in the land to sign the instruments which they, the plaintiffs, were signing. * * * the plaintiffs, knowing that there remained less than two years of the period of prescription, were advised against signing a joint lease with the holders of the one-fourth mineral interest. * * *"

See, also, Kennedy v. Pelican Well Tool & Supply Co., supra, and English v. Blackman, 189 La. 255, 179 So. 306.

In the instant case, eight of the plaintiffs who testified assigned very substantial reasons why they did not intend to and refused to enter into a joint lease with the mineral owners, because their mineral rights only had an additional twenty-eight days to run, at which time the plaintiffs, as landowners, would not own merely 17.5% of the minerals, but would also become the owners of the 82.5% held by the mineral owners and lost by prescription for nonuse of their mineral servitudes. They had legal advice to that effect.

In the case of English v. Blackman, 189 La. 255, 179 So. 306, 310, the Court had before it a similar situation in which the plaintiff's position was less favorable than that of the plaintiffs' in the present litigation. In that case the landowner had established a servitude on the property in favor of a grantee and wrote a letter stating that the mineral rights would expire at the end of 1935, and that he would be willing to extend the rights for the year of 1936 for a cash consideration. In reply to

the letter, the United Gas Public Service Co., the owner of the mineral rights under the servitude, on July 10, wrote him calling his attention to a lease signed by him with others in 1932, stating:

" 'This was a joint contract signed by all parties and from the face of it, it would appear that you are recognizing the interests of the various parties signing. If you can secure a disclaimer of title from these parties, we will be glad to change our records to show you as owning the entire mineral interest, but until you do so, we will be compelled to pay these people delay rentals under the terms of the lease.' "

In disposing of the issue, the Court said:

"This ended the correspondence, so far as the record discloses. Thereafter, the company sent to English not all, but his pro rata share of the rentals under the 1932 lease, which share of the rentals he accepted.

"Now, it is argued that his acceptance of these rentals after the company had called his attention to the 1932 lease 'is a barrier which prevents the acceptor, "in the same breath," to deny their existence.'

" * * * When English accepted the benefits referred to, the servitudes which he granted were already prescribed. Since they had not been exercised and the running of prescription against them had not been interrupted within the ten-year period after their execution, they expired, became extinct. They were dead things, and the mere acceptance of the benefits of the new lease thereafter did not resurrect them. Accrued prescription cannot be 'interrupted,' of course."

The acceptance of the delayed rentals by the plaintiffs began in December, 1936, and each year subsequent thereto for four years. But this happened after the defendants' mineral rights had expired and, therefore, the acceptance of less than the full amount of the delayed rentals by the plaintiffs could not have the legal effect of reviving the mineral rights of the defendants against which prescription had accrued.

The question of whether or not the landowners, under the circumstances of this case, intended to enter into a joint lease with the mineral owners, is one of fact. The clear preponderance of the evidence supports the conclusion reached by our learned brother below that the plaintiffs did not enter into a joint or pooling lease with the defendants and, therefore, the mineral owners' rights expired at the very latest on January 15, 1936.

The plea of estoppel filed by the defendants is not well-founded, because the record shows that the plaintiffs did not do anything which could mislead the defendants. They did not make any representations to defendants upon which they relied in subsequently signing the lease of December 18, 1935. The agent of the lessees, who negotiated the lease, did not represent the plaintiffs. He was never authorized directly or indirectly by the plaintiffs to permit the defendant mineral owners to sign the lease, but, on the contrary, was told that under no circumstances would the plaintiffs sign the joint lease

with the mineral owners. Furthermore, the plaintiffs did not hold out the representative of the lessees as their agent. The mineral owners knew that their rights were about to prescribe and it was encumbent upon them, if they wished to have their rights extended or renewed, to take proper legal steps to accomplish those purposes. They failed to do so.

With reference to the plaintiff, Mrs. Effie White Shaw, who did not sign the 1935 lease, the defendants make the point that she intended the 1935 lease to be a joint one, as shown by the "Co-lessors' Agreement", signed by her on September 5, 1936. This agreement refers to the lease of December 18, 1935, and states that she takes cognizance of the stipulations contained therein and joins therein for the consideration of $250 cash, besides the other benefits of the lease. The document is signed only by Mrs. Shaw and the lessees and not by any of the other plaintiffs or the defendants. Nothing is said in the document about the lease of December 18, 1935, being a joint lease between the land and mineral owners in favor of the lessees. Mrs. Shaw testified that when F. F. Meadows, one of the mineral owners, asked her to sign the agreement, he positively assured her that the mineral owners were not parties to it, except the widow and heirs of Dr. Craighead, whose mineral rights came into existence in 1931 and had not expired. Although Meadows testified for the defendants, and signed the document as a witness, he did not, in his testimony, contradict Mrs. Shaw's statement.

Mrs. Shaw was the only one of the plaintiffs who did not sign the lease of December 18, 1935, and her only connection with it is the "Co-lessors' Agreement" of September 5, 1936. Nothing is stated in this agreement which would, in the slightest, indicate that she intended to further extend the rights of the mineral owners or to interrupt prescription, or to revive any servitudes against which prescription had accrued. Since the lease of January 15, 1931 expired on January 15, 1936, the rights of the mineral owners, as extended by its provisions, came to an end, and were prescribed. It was several months thereafter when the "Co-lessors' Agreement" was entered into, and as this document in no way shows that Mrs. Shaw waived accrued prescription or attempted to create a new servitude in favor of the mineral owners, who were in no way parties to the document, the claims of the defendants as against Mrs. Shaw are without merit.

The defendants contend that their mineral rights insofar as the minors, Maxine and Elaine White, are concerned are still in existence, because their tutrix signed the joint lease of January 15, 1931, with proper authorization of the district judge, and as their mineral rights were thereby extended to January 15, 1936, the five year mineral lease of December 18, 1935, having been entered into by their tutrix with proper authorization of court, with the full intention of making it a pooling or joint lease with the mineral owners, kept their mineral rights in existence so that when the drilling operations, commencing in January, 1941, proved to be successful, they

became entitled to their pro rata share of the royalties from this production.

The record shows that the petition under which the tutrix sought the authorization of the court, under Act No. 319 of 1926, without the benefit of the deliberations of a family meeting, to enter into a lease with the minors' co-owners in favor of the Trinity Drilling Company, as lessee, was presented to the Court on February 17, 1931. Annexed to the petition is the concurrence of the undertutor (recommending that the tutrix be authorized to enter into the lease) as well as an incomplete copy of the proposed unsigned and undated lease with the Triangle Drilling Company, Inc. In neither the petition nor the annexed documents is anything stated that the tutrix had already signed the lease of January 15, 1931, and that her actions in that respect should be ratified and approved by the court. Likewise, the order of court is silent in that respect. Nowhere in the tutorship proceedings does it appear that the tutrix or undertutor was recommending to the court that she be authorized to enter into a joint pooling lease with the mineral owners. The proceedings are likewise silent that the tutrix proposed and recommended (which recommendation was concurred in by the undertutor) that the life of the mineral servitudes existing on the property in question in favor of the defendants be extended, or that prescription which had been running against those servitudes for a period of more than five years at that time, be interrupted. The judge's order authorizing the tutrix to enter into a lease does not contain any provision covering the above matters.

The attorneys for the minors make three points:

(1) That the tutrix having signed the lease of January 15, 1931, without any authorization whatsoever, her actions in that respect could not bind the minors. They also state that, as the tutrix did not receive any authorization to ratify and confirm her previous act and did not, after being authorized by the court to enter into a lease, carry out the order of the court, but permitted her original action to stand, the minors were not legally bound.

(2) That even if the lease of 1931 legally bound the minors, it could only be considered as a lease with their co-owner joint heirs or plaintiffs, the landowners, and under no circumstances could it be construed as a joint or pooling lease with the mineral owners, insofar as the minors are concerned, because the tutrix was not authorized by the court to extend the lives of the mineral servitudes or interrupt prescription in favor of the mineral owners, who were in no way mentioned.

(3) That the minors received consideration for entering into the lease only from the lessee and nothing whatsoever from the mineral owners for the alleged extension of their mineral rights or the alleged interruption of prescription, which was running against those rights and, therefore, the tutrix under the express provisions of Article 354 of the Revised Civil Code was prohibited from gratuitously dis-

posing of any of the minors' valuable property rights.

As already pointed out in this opinion with reference to the first main issue, the evidence shows that the lessee, under the 1931 lease, insisted that the nine judgments against some of the landowners that primed some of the mineral rights, as well as the Federal Land Bank mortgage, which primed all of the mineral owners' rights, be paid so that the lessee's rights would not be subordinate thereto or affected thereby. It was agreed between the lessee and the mineral owners that the $2,000 bonus or cash rental money be used to liquidate the judgments or judicial mortgages, and that the lessee be authorized to use the delayed rental money each year to pay the installments maturing on the Federal Land Bank mortgage, which the bank officials had previously refused to subordinate to the lease. The lessee's agent and L. M. Moffitt, Secretary-Treasurer of the Triangle Drilling Company, Inc., and the Trinity Royalty Company, Inc. and Dr. Craighead, another mineral owner, insisted that this be a part of the agreement. The plaintiffs took no part in the negotiations between the lessee and the mineral owners in arriving at this understanding. It, therefore, appears that the bonus and delayed rental money used for the purpose above stated was not intended by any of the parties to be the consideration for the minors extending the life of the mineral servitudes or interrupting prescription, which was running against them. This arrangement was purely for the protection of the lessee, which insisted on this being done. This is made

clear because in the tutorship proceedings neither the petition, the concurrence of the undertutor, nor the order of the court deal with the questions of extending the durations of the servitudes or interrupting prescription running against the servitudes so as to start it running anew. It must be remembered that the present contest is between the landowners and the mineral owners and not between the landowners and the present lessees or former lessee. Therefore, this is not a case where the minors are attempting to repudiate the leases while retaining the benefits received by them from the lessees.

We think there is merit in all three of the minors' contentions. The only way that the tutrix can legally obligate the estate of a minor is by a strict compliance with the law in securing from the court proper authorization to do so. In this case there was neither a reasonable nor substantial compliance with the provisions of Act No. 319 of 1926 protecting the rights of minors, as the court was not apprised in the slightest that the tutrix had already entered into the lease or that the mineral servitudes would be extended, or the prescription running against them would be interrupted.

As the tutrix was without proper authorization of the court to enter into the lease of January 15, 1931, and particularly without any right or authority to bind the minors by extending the duration of the servitudes beyond the ten year prescriptive period for nonuse, or by interrupting prescription running against the servitudes and to start it running anew, the defend-

ants' mineral servitudes, insofar as the minors were concerned, expired not later than April 8, 1935, or ten years after the creation of the last mineral servitude by the minors' ancestor in title, their grandfather, E. C. White.

■■■ The defendants contend that the tutrix was properly authorized on December 17, 1935, to sign the alleged joint pooling lease of December 18, 1935, and intended to extend the lives of their servitudes for an additional five years or the primary term of the lease. They point out that annexed to the petition of the tutrix seeking the authorization of the court to sign the lease is a photostatic copy of the lease with the riders showing the proportionate interests of the landowners and mineral owners, and their respective names, and that a great many of the landowners, as well as some of the mineral owners, had already signed the proposed lease. The original petition and the annexed documents are in the record and it appears that the tutrix and the undertutor, in proper person, without an attorney appearing for them, presented the matter to the court. It is alleged that the minors are co-owners of the property and it was to their advantage to enter into a lease with the United Gas Service Co., the Standard Oil Company of Louisiana, and the Sugar Creek Syndicate, Inc., with "the rest of their co-owners or the majority of them", for a period of five years, commencing January 15, 1936, and that the minors' interest be pooled; that the minors were to receive a consideration of $23.50 cash; that it was

to the interest of the minors that the valuable gas and oil deposits in the land be developed; and that a family meeting be dispensed with. The judge's order, dated December 17, 1935, authorized the tutrix to sign the oil, gas and mineral lease, in behalf of the minors, a photostatic copy of which was annexed to the petition. Nothing is said in any of the proceedings by the tutrix or undertutor that the servitudes of the mineral owners were dead and nonexistent, or that it was the intention of the tutrix, the undertutor and the judge to authorize the renewal of the extinct servitudes or to create new ones in their place in favor of the former mineral owners, or that it was their intention to attempt to extend the duration of these extinct servitudes, or to interrupt or waive prescription with reference to them.

Therefore, the signing of the lease of December 18, 1935, by the tutrix, in behalf of the minors, in no way waived the accrued prescription in their favor and did not create in the mineral owners any further or additional rights.

The defendant, O'Brien Bros., Inc., concedes that if the judgment of the district court is correct, their mineral rights in the forty acre tract described as the SW¼ of NE¼ of Sec. 36–20N–6W, Claiborne Parish, Louisiana, has also been lost by prescription. The alternative claim of this defendant covers the mineral rights in the forty acre tract described as the SE¼ of the NW¼ of Sec. 36–20N–6W, and is based upon the grounds (1) that under Article 792 of the Revised Civil Code, prescription

did not toll against the servitude, because of an obstacle; and (2) that the doctrine of contra non valentem was applicable.

■ The documentary evidence shows that on April 8, 1925, E. C. White, the fee simple owner of the property and ancestor of all of the plaintiffs (from whom they inherited their rights), executed a deed in favor of O'Brien Bros., Inc., to one-eighth of the mineral rights in and to an 80 acre tract of land described as the SW¼ of NE¼ and SE¼ of NW¼ of Section 36–20N–6W, with full warranty of title. Prior to the date of this sale, White had disposed of all of his mineral rights in and to the SE¼ of the NW¼ of Sec. 36, by previous recorded sales in favor of the other mineral owners, the other defendants herein, who joined with the plaintiffs as landowners in making the lease of January 15, 1931. This defendant, therefore, contends that prescription against its rights did not begin to run until January 15, 1936, the date the mineral owners' servitudes and the lessee's rights expired.

Article 792 of the Revised Civil Code reads as follows:

"If the owner of the estate to whom the servitude is due, is prevented from using it by any obstacle which he can neither prevent nor remove; the prescription of non-usage does not run against him as long as this obstacle remains."

In the case of Hightower v. Maritzky, supra, the Court held that although the above Article of the Code is found under the title of "Predial Servitudes", it applied to personal servitudes as well. As the rights of the mineral owners, acquired by prior recorded sales, were superior in every respect to the rights acquired by O'Brien Brothers, Inc., from E. C. White, under their warranty deed, there was absolutely nothing that this defendant could do to interrupt the running of prescription between April 8, 1925, and January 15, 1936. The corporation could not exercise the servitude by drilling on the property or joining in a mineral lease to have it drilled. It could not sue for a partition until the superior rights of the mineral owners expired by prescription, because it was not a co-owner with the owners of the mineral rights. It also appears that the defendant did not purchase with knowledge of the obstacle nor consent to it. There is nothing in the record which would suggest in the slightest that E. C. White, the vendor, and the defendant, the vendee, were attempting—by a subterfuge contrary to public policy—in entering into this sale of mineral rights, to create a servitude in order to avoid the ten year prescriptive period for nonuse, and to give the servitude legal existence beyond that period of time. The transaction was a bona fide one supported by valuable consideration paid by the vendee to the vendor and, therefore, its rights should be protected.

It is our view that the obstacle in question prevented prescription from running against the defendant until January 15, 1936.

The case of Coyle v. North Central Texas Oil Co., Inc., 187 La. 238, 174 So. 274, relied upon by the plaintiffs, is not appropriate, because there the mineral purchaser

had knowledge of an existing mineral lease and acquired its rights expressly subject thereto, and the existing lease was one of the factors that induced the purchaser to acquire its mineral rights.

The case of Gailey v. McFarlain, 194 La. 150, 153, 193 So. 570, is not in point, because the Court rested its opinion on the ground that as the fee simple landowner had not conveyed his reversionary interest in the minerals to the mineral purchaser, the law of accretion was inapplicable in favor of the purchaser, and the mineral rights lost by nonuse for 10 years reverted to the fee simple owner.

 In the case of St. Landry Oil & Gas Co., Inc., v. Neal et al., 166 La. 799, 118 So. 24, 25, the Court said:

"Ordinarily, where one sells the property of another—and the rule is equally applicable to the granting or sale of mineral leases— and later acquires title to the property sold by him, the title vests immediately in his vendee. Bonin v. Eyssaline, 12 Mart., O.S., 185, 227; McGuire v. Amelung, 12 Mart., O.S., 649; Woods v. Kimbal, 5 Mart., N.S., 246; Fenn v. Rils, 9 La. 95, 100; Stokes v. Shackleford, 12 La. 170; Lee v. Ferguson, 5 La.Ann. 532; [City of] New Orleans v. Riddell, 113 La. 1051, 37 So. 966; Wolf v. Carter, 131 La. 667, 60 So. 52; Brewer v. New Orleans Land Co., 154 La. 446, 97 So. 605."

 The jurisprudence is also well-settled that the obligation imposed by the warranty of the ancestor is just as binding upon his heirs, who have accepted his succession, as it is upon the ancestor himself. Griffing, et al. v. Taft (on rehearing), 151

La. 442, 91 So. 832, and Berry et al. v. Wagner et al. (on rehearing), 151 La. 456, 91 So. 837.

The record in this case clearly shows that the plaintiffs, as heirs of their deceased father, accepted his succession purely, simply, and unconditionally.

As the prescriptive period of ten years did not begin to run against this defendant's mineral rights until January 15, 1936, and the drilling operations, resulting in the discovery of oil in paying quantities, were begun in January, 1941, obviously this defendant's mineral rights have not prescribed.

The judgment of the district court in disallowing this claim is incorrect and will be amended in that respect.

The plaintiffs have filed answers to the appeals in four of the cases asking that the judgments be clarified or amended so as to order the cancellation and erasure of the sales of mineral rights by the original servitude owners to subsequent purchasers, all of whom are defendants before the court. As we have concluded that the trial judge correctly maintained the plea of prescription as against all of the servitudes, except the one in favor of O'Brien Brothers, Inc., the mineral rights of the subsequent purchasers fall with those of the original grantees from whom those mineral rights were obtained.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment in the case of Virgil F. White et al. v. O'Brien Brothers, Inc., No. 16,599 of the docket of the Second Judicial District

Court, Claiborne Parish, be amended by rendering judgment in favor of the defendant, O'Brien Brothers, Inc., and against the plaintiffs therein, overruling the plea of prescription of ten years liberandi causa, insofar as its mineral rights or servitude of one-eighth (⅛) of the minerals in the SE¼ of the NW¼ of Sec. 36–20N–6W, Claiborne Parish, acquired by O'Brien Brothers, Inc., from Eligih C. White, dated April 8, 1925, and recorded in Conveyance Records of Claiborne Parish, La., in Book 55, page 192, is concerned, and recognizing O'Brien Brothers, Inc., as the owner of the above mineral rights or servitude, and, as thus amended, the judgment is affirmed; the plaintiffs therein to pay one-twelfth of the costs of both the district and this Court.

It is further ordered, adjudged and decreed that the judgment in the case of Virgil F. White et al. v. Acme Land & Investment Company, Inc., No. 16,600 of the docket of the Second Judicial District Court, Claiborne Parish, be amended so as to further decree that the mineral deed from R. O. Roy to the Acme Land & Investment Company, Inc., dated May 1, 1935, and recorded in the Conveyance Records of Claiborne Parish, Louisiana, in Book 94, page 34, be cancelled from the records of Claiborne Parish, Louisiana, and that, as thus amended, the judgment is affirmed;

It is further ordered, adjudged and decreed that the judgment in the case of Virgil F. White et al. v. E. H. Fortson et al., No. 16,601 of the docket of the Second Judicial District Court, Claiborne Parish, be amended so as to further decree that

the mineral deed from E. H. Fortson to F. F. Meadows, dated February 24, 1930, and recorded in the Conveyance Records of Claiborne Parish, Louisiana, in Book 77, page 23, be cancelled and erased from the records of Claiborne Parish, Louisiana, and as thus amended, the judgment is affirmed;

It is further ordered, adjudged and decreed that the judgment in the case of Virgil F. White et al. v. J. K. Wadley et al., No. 16,602 of the docket of the Second Judicial District Court, Claiborne Parish, be amended so as to further decree that the mineral deed from J. K. Wadley to T. J. Hibbler, dated March 11, 1930, and recorded in the Conveyance Records of Claiborne Parish, Louisiana, in Book 77, page 63, be cancelled from the records of Claiborne Parish, Louisiana, and, as thus amended, the judgment is affirmed; and

It is further ordered, adjudged and decreed that the judgment in the case of Virgil F. White et al. v. Trinity Royalty Company, Inc., No. 16,603 of the docket of the Second Judicial District Court, Claiborne Parish, be amended so as to further decree that

The mineral deed from A. J. Hodges et al. to Trinity Royalty Co., Inc., dated January 8, 1931, and recorded in the Conveyance Records of Claiborne Parish, Louisiana, in Book 83, page 183, and

The mineral deed from G. L. Shields to Marmaduke Ward, dated February 27, 1925, and recorded in the Conveyance Records of Claiborne Parish, Louisiana, in Book 55, page 70, and

The mineral deed from G. L. Shields to A. J. Hodges, dated February 28, 1925, and recorded in the Conveyance Records of Claiborne Parish, Louisiana, in Book 55, page 78, all be cancelled and erased from the records of Claiborne Parish, Louisiana, and, as thus amended, the judgent is affirmed; and

It is further ordered, adjudged and decreed that the costs of both the district court and this court are to be paid by the defendants, except the one-twelfth (1/12) of the costs of both courts to be borne by the plaintiffs in the case of White et al. v. O'Brien Brothers, Inc., No. 16,599 of the docket of the Second Judicial District Court, Claiborne Parish, as hereinabove ordered.