64 So.2d 202 (1953)
222 La. 868
ARKANSAS LOUISIANA GAS CO.
v.
THOMPSON et al.
No. 40511.
Supreme Court of Louisiana.
July 3, 1952.
On Rehearing January 12, 1953.
Rehearing Denied March 23, 1953.
H. C. Walker, Jr., Robert Roberts, Jr., Gilbert L. Hetherwick, George Conger, Shreveport, for plaintiff-appellant.
Oliver & Digby, Monroe, for defendants-appellees.
Barham & Elder, Ruston, for defendants-appellants.
LE BLANC, Justice.
This is a suit brought under the provisions of the Uniform Declaratory Judgment Act, LSA-R.S. 13:4231-13:4246, to have determined the ownership of the mineral rights in a tract of land consisting of 140 acres, located in the Ruston Gas Field in Lincoln Parish, said land comprising the East Half of Southwest Quarter of Southeast Quarter (E½ of SW¼ of SE¼), and the Southeast Quarter of Southeast Quarter (SE¼ of SE¼) of Section 36, Township 19 North, Range 3 West, and the South Half of Southwest *203 Quarter (S½ of SW¼) of Section 31, Township 19 North, Range 2 West.[1]
The proceeding was provoked by the Arkansas Louisiana Gas Company which alleged itself to be the owner of a valid oil, gas and mineral lease covering the property in question, which lease, it further alleged, has been maintained and is at present in full force and effect. It sets out in detail, in the petition, the ownership of the mineral rights, subject to its lease, in the following parties: John W. Thurmon, W. S. Moore, Add Thompson, Mrs. Lois Oliver Holstead, James O. Holstead, George B. Holstead, Jr., Glen L. Shadow, Mrs. Zoe Heard McGinty, and Mrs. S. J. Heard as owners of the mineral rights in one part of the property and Glen L. Shadow, Mrs. Zoe Heard McGinty and Mrs. S. J. Heard as owners in the other part.
It is then alleged that Dhu Thompson, Lanier and Lea S. Thompson, all residents of Ouachita Parish, claim to be the owners of the same mineral rights and have made formal claims to such ownership through letters addressed to petitioner and its attorneys. It is further alleged, however, that the said Thompsons are not the owners of any mineral rights in the property and that any rights they may have had heretofore, have never been exercised, nor interrupted nor suspended so as to prevent the loss thereof by the prescription of ten years, liberandi causa, under the laws of this state and particularly Article 3546 of the LSA-Civil Code which prescription is expressly pleaded.
It is also alleged that of what mineral rights the Thompsons may have had in the West ½ of the SW¼ of the SW¼ of Sec. 31, Township 19 North, Range 2 West, a certain interest was acquired by the North Central Texas Oil Company, Inc., by virtue of certain conveyances which are fully described, but as to these also it is alleged that the North Central Texas Oil Company is not now the owner of any such mineral rights and what it may have acquired through the said conveyances has never been exercised and has been lost by the same prescription of ten years liberandi causa.
All of the parties mentioned in the petition are made defendants in the proceeding and judgment is prayed for declaring the oil, gas and mineral lease in favor of petitioner by all of the parties other than the Thompsons to be a valid and currently effective lease and that the ownership of the mineral rights in the said property, subject to the said lease be declared to be in all of the parties in the respective proportions and interests as set out in the petition, and further that there be judgment against Dhu Thompson, Lanier Thompson and Lea S. Thompson and North Central Texas Oil Company, Inc., sustaining the prescriptions pleaded.
North Central Texas Oil Company, Inc., appeared in answer to the citation served on it and disclaimed all interest in any of the mineral rights and further answered admitting that any rights it may formerly have owned have been lost by prescription.
Dhu Thompson, Lanier Thompson and Lea S. Thompson answered denying the allegations of the petition and affirmatively averring that prescription liberandi causa has not run against their ownership of the mineral rights. In support thereof they set out the various deeds and transactions under which they present their claim. All of these will be hereinafter referred to. Accordingly they pray for judgment in their favor decreeing them to be the owners of the entire minerals in and under the property and entitled to those that may have been produced therefrom and that the plaintiff be ordered to account to them for such production as may hereinafter accrue.
All of the other parties made defendants also answered. It may be said that they virtually joined the Arkansas Louisiana Gas Company in all of the allegations of its petition and prayed for judgment in the same manner.
The case was submitted to the District Court on the production and the offering in evidence of all the documents involved and *204 in addition, on a stipulation of facts entered into by counsel for all parties in interest. There was a very short note of testimony taken which testimony affects the case only according to the view that is taken of the issues presented and on the basis on which they are to be decided.
The District Judge rendered judgment with written reasons overruling the pleas of prescription filed by the plaintiff and the remaining defendants who claim to own the mineral rights, recognizing the defendants Dhu Thompson, Lanier Thompson and Lea S. Thompson as the owners of said mineral rights in the property in the proportions set forth by them in their answer, and further ordering the plaintiff, Arkansas Louisiana Gas Company, to pay to the said Thompsons the value of their interest out of all the production, subject to a credit of their proportion of the costs of operations. Appeals were taken by the plaintiff and certain of the defendants.
The pertinent facts of the case are not disputed. Chronologically they are as follows:
On March 8, 1915, Dhu Thompson, then married to Lea Stamper Thompson, with whom he was living and between whom the community of acquets and gains existed, purchased the property described in plaintiff's petition from the heirs of Harrison Roane. On March 30, 1915 he sold the tract of land, as described, to James M. Gibson. The sale to Gibson contained the following reservation:
"It is distinctly understood by and between the parties hereto that all Oil Rights, in, upon and under the property herein conveyed is reserved by the vendor herein, with the usual rights of ingress and egress, which reservation is considered as part of the consideration in this act."
Mrs. Lea S. Thompson died on June 11, 1918, being survived by her husband and two children, Lanier Thompson and Lea S. Thompson, the latter, a three day old infant, born on June 8, 1918. In that same month proceedings were instituted in the District Court of Lincoln Parish entitled "Tutorship of the Minor Heirs of Mrs. Lea Stamper Thompson", as a result of which all the property of the minors, as included in the inventory taken of her estate, was adjudicated to the father, Dhu Thompson. The inventory did not contain any reference to the mineral rights which had been reserved by their father in the sale to James Gibson.
On June 9, 1919 James M. Gibson and Dhu Thompson entered into an agreement purporting to be a correction deed of the sale executed between them on March 30, 1915 with regard to the reservation therein contained. This instrument, after quoting the reservation verbatim, contains the following clause with regard thereto:
"Now, be it known and remembered, that it was the intention of the parties to said act, aforesaid, that the reservation above made should not only cover all oil rights, also covered all gas and other minerals, in, under and on said premises, with all necessary rights of ingress and egress, and other rights incidental to operations, and producing said oil, gas and other minerals; all of which rights are hereby conveyed to the said Dhu Thompson, the vendee named in said deed."
Beginning in the year 1935, more than ten years after the date of the reservation made by Thompson in his deed to him, James Gibson, considering himself to be the owner of the minerals, executed several mineral sales and mineral leases covering the said property. It is through these sales and leases that the defendants, Thurmon, Shadow and others who are claiming adversely to the Thompsons, assert their interests.
It is not disputed that prior to 1944, prescription liberandi causa was suspended by the minority of a servitude holder and anyone holding with him. This doctrine was first laid down in the case of Sample v. Whitaker, 172 La. 722, 135 So. 38 and was consistently followed until Act 232 of *205 1944 was adopted by the Legislature of Louisiana.[2]
Lea S. Thompson who was born on June 8, 1918 was emancipated on May 17, 1937. From the date of the reservation made by his father in the sale to Gibson on March 30, 1915 to the date of his mother's death, there elapsed three years, two months and eleven days. Therefore, of the ten year prescription as applicable at that time, there remained a period of six years, nine months and nineteen days. The prescription which had been suspended during the minority of Lea S. Thompson at the time of the death of Mrs. Thompson in 1918, began to run again after his emancipation on May 17, 1937. Six years, nine months and nineteen days from May 17, 1937 brings us to March 6, 1944, on which latter date prescription would have accrued. It is not disputed that that is the date on which the Thompsons would have lost any mineral rights they had in the property had it not been for subsequent acts which, in the meantime, they contend, had interrupted prescription.
Prior to or during the year 1943 the Arkansas Louisiana Gas Company acquired oil, gas and mineral leases from James Gibson and from the parties to whom he had allegedly sold mineral interests in and to the property.
In November 1943, Arkansas Louisiana Gas Company conceived the idea of pooling a 640 acre unit of land in the area including the 140 acre tract here involved, on which they held the leases. A pooling agreement was prepared by their own attorneys who obtained the necessary signatures from all parties concerned. During that time the abstract of title covering the land involved in this proceeding was being examined by one of their attorneys who discovered the possibility that the Thompsons may still have a mineral interest in the property and the company was advised accordingly.
In accordance with this advice, apparently, on December 13, 1943 it secured an oil, gas and mineral lease from Dhu Thompson and his two sons covering the 140 acre tract of land. That lease contained the following clause:
"The consideration for the granting of this lease is that the lessee, Arkansas Louisiana Gas Company, shall commence the drilling of a well within a distance of one mile from this property on or before April 1, 1944, and in the event that said well is not commenced by the said lessee on or before the date herein set out, then in that event the said lessee, Arkansas Louisiana Gas Company, shall release and return this lease to the lessors and be relieved of any further obligation or liability."
It is not clear as to the exact date on which the Thompsons were asked to and did sign the pooling agreement but presumedly it was also about at the same time as they entered into the lease with the Arkansas Louisiana Gas Company.
The instrument under which the 640 acre unit was pooled was a conventional agreement among all the parties thereto and it contains the following stipulations:
"For all purposes, the mineral leases heretofore granted by mineral owners, and all other mineral rights now owned by Mineral Owners, insofar as they grant the right to develop for and produce gas, natural gasoline extracted from the gas, and condensate liquids normally produced in the operation of a gas well in the above described 640 acre `unitized tract' are hereby pooled and unitized and shall be treated, developed and operated for the purposes of said mineral leases and mineral rights, affecting said property as one unit and one tract."
And further it stipulated:
"The drilling in search of gas, or the production of the unitized minerals under the terms of this agreement on any portion of the unitized tract hereinabove described, shall be taken and *206 accepted as such drilling and production under the terms of each of the mineral leases or mineral contracts covering, applying or affecting the unitized tract, and so long as there may be any drilling or production hereunder on any portion of such unitized tract, such drilling and production shall produce the same effect respecting the continuance of all leases in force and effect as if drilling had been done on or production secured from that portion of the unitized tract under the separate lease or leases covering said portion of the unitized tract."
From the stipulation entered into by counsel for all parties it is shown that pursuant to a permit issued by the Commissioner of Conservation on January 4, 1944 the Arkansas Louisiana Gas Company began the drilling of a well in search of gas on the unit that had been pooled but not, however, on the 140 acre tract that is involved in this suit. These operations were not successful and on March 25, 1944 the well was abandoned as dry. It is conceded by the stipulation of counsel that since this well had been drilled to a depth at which there was reasonable expectation of production this amounted to good faith drilling of the unit. This, according to the jurisprudence, constituted such drilling as amounted to a sufficient use of the servitude to interrupt prescription. See Lynn v. Harrington, 193 La. 877, 192 So. 517; Standard Oil Co. of Louisiana v. Futral, 204 La. 215, 15 So.2d 65; Union Sulphur Company v. Lognion, 212 La. 632, 33 So.2d 178.
According to the stipulation, it further appears that on March 31, 1949, and later corrected as of April 6, 1949, the Commissioner of Conservation issued an order with reference to fieldwide rules governing the exploration for and production of gas and/or condensate from the Ruston Field in Lincoln Parish. Also it appears that on September 1, 1949 Arkansas Louisiana Gas Company applied to the Commissioner of Conservation for a permit to re-work the well which it had abandoned previously and to drill that well to a greater depth. The Commissioner issued the permit on September 6, 1949 and re-working operations were commenced on or about September 19, 1949. On or about December 3, 1949 the well was completed as a producer in commercial quantities of gas at a depth of 9351 feet and it has continued producing in paying quantities until the present time.
Counsel for Arkansas Louisiana Gas Company and for the defendants other than the Thompsons make the contention that, when the pooling agreement which was signed by all the parties in this proceeding, including James M. Gibson and the Thompsons, it was not the intention of Gibson to acknowledge any mineral rights in favor of the Thompsons but that on the contrary he specifically intended to acknowledge them in favor of the parties to whom he had sold the mineral interests he thought had reverted to him. In rejecting the contention the trial judge indicated in his written reasons for judgment that as the Thompsons were the owners of the mineral, oil and gas rights, they had the right, power and authority to unitize their interests along with other mineral holders, without the signature or concurrence of Gibson and the persons to whom he had endeavored to sell mineral rights which he did not own. He held that Gibson had only a reversionary right in the minerals and that this did not constitute such an interest in him or those who held under him to warrant making them parties to the pooling agreement, basing his holding on this point on the decision of this court in the case of Sanders v. Flowers, 218 La. 472, 49 So.2d 858.
In this respect we are of the opinion that the trial judge was in error, the difference in the case relied on by him and the present being that in that case there was a valid order of the Commissioner of Conservation forcing the pooling of the unitized tract of land, which order was granted under the police power of the State in the interest of the conservation of oil, gas and other minerals and what was held was that the landowner who had only a reversionary right in the minerals was without right or interest to question the orders of the Commissioner. As aptly pointed out in brief of counsel for plaintiff, just as the landowner *207 cannot increase the burden of the mineral owner, by creating smaller tracts out of the original larger tract, through sales of portions of the larger tract, see Connell v. Muslow, 186 La. 491, 172 So. 763, neither can the mineral owner lessen or diminish his burden or obligation, in the absence of the landowner's consent or the intervention of some governmental authority. In this case the pooling instrument was a voluntary agreement entered into at will and Gibson, as the owner of land included in the unit, was a necessary party to the agreement.
However we are of the opinion that the trial judge was correct in the conclusion he reached in overruling the plea of prescription against the mineral interests of the Thompsons. The very wording of the pooling agreement which was voluntarily signed by the landowners and the mineral owners shows that the intention of all the parties was that they were thereby pooling and unitizing their interests for all purposes, and that the unitized tract was "to be treated, developed and operated for the purpose of said mineral leases and mineral rights, affecting said property as one unit and one tract." It further provided that "the drilling in search of gas * * * on any portion of the unitized tract * * * shall be taken and accepted as such drilling * * * under the terms of each of the mineral leases or mineral contracts covering, applying or affecting the unitized tract, and so long as there may be any drilling * * * on any portion of such unitized tract, such drilling * * * shall produce the same effect respecting the continuance of all leases in force and effect as if drilling had been done on or production secured from that portion of the unitized tract under the separate lease or leases covering such portion of the unitized tract." (All emphasis supplied.) There is no doubt that in December 1943, the Thompsons were the owners of mineral rights on the 140 acre tract which would prescribe on March 6, 1944. In order for them to retain those rights beyond this latter date, it was necessary that prescription be interrupted or that the landowner, Gibson, acknowledge them in some manner. It would seem that the drilling of the dry well was sufficient, under the language of the contract which we have quoted, to interrupt prescription, but we prefer to base our opinion on the acknowledgment of the Thompson's rights by Gibson when he signed with them the unitizing agreement under which the land was pooled with others in the 640 acre unit. The following additional clause contained in the agreement makes his acknowledgment clear:
"This agreement is executed with the specific purpose and intent on the part of each of the parties hereto to acknowledge the ownership of each and all of the parties hereto of their respective interests in and to the oil, gas, distillate, condensate, and other minerals and mineral rights in the lands pooled herein, so as to interrupt the running of the liberative prescription of non-use".
The wording of the agreement dispels the contention made that Gibson's intention was to acknowledge rights of the other parties to whom he had sold mineral interests and never intended to acknowledge those of the Thompsons. Mere error or mistake on his part in signing the agreement is not sufficient to set it aside. It can only be set aside on the ground of fraud and there is no charge of fraud made against any one.
For the reasons stated the judgment of the district court is found to be correct and it is therefore affirmed at the costs of the appellants.

On Rehearing
FOURNET, Chief Justice.
The pleadings and the issues of this case are so clearly and concisely stated in the original opinion that they will not be restated. As pointed out when the case was originally before us, the Arkansas Louisiana Gas Company, proceeding under the Uniform Declaratory Judgments Act, LSA-R.S. 13:4231-13:4246, is seeking to have declared valid a certain oil, gas and mineral lease, acquired by it on February 23, 1943, from the landowner, J. M. Gibson (not a party to this suit), and vendees *208 from Gibson or their successors in title of fractional mineral interests, namely, Glen L. Shadow, W. S. Moore, John W. Thurmon, Mrs. Lois Oliver Holstead, James O. Holstead, George B. Holstead, Jr., Mrs. Zoe Heard McGinty and Mrs. S. J. Heardwho are made defendants; and to have declared prescribed, because of nonuse, the claims of the other defendants, Dhu Thompson and his two sons, Lanier and Lea S. Thompson, to all the minerals in and under the land by virtue of a reservation thereof when Dhu Thompson sold the land to Gibson in 1915.
When the case was originally before us we affirmed the judgment of the lower court overruling the plea of prescription against the mineral interests of the Thompsons, and condemning plaintiff to pay to them $13,344.78, their proportion of the value of production from the well on the unit. In reaching this conclusion we rejected the contention that Gibson had never intended to acknowledge the rights of the Thompsons but only those of his mineral vendees, in view of the clear wording of the instrument by which the plaintiff, joined by the several lessors, pooled the leases held by it in order to develop them as a unit. A rehearing was granted primarily for the purpose of reconsidering this issue.
The Thompsons, contending for the correctness of our previous ruling, pitch their case solely on the provisions of the pooling agreement. They assert that parol evidence is inadmissible for the purpose of negativing the effect of a contract through error where there is no fraud charged; that according to its plain provisions everyone having an interest was to be asked to sign; that Dhu Thompson's mineral reservation was of record in Lincoln Parish, and Gibson was therefore charged with knowledge that Thompson would be asked to sign. They also claim that, the land having been pooled in an integrated unit, drilling on any part of the pooled area was a use of the Thompson servitude and interrupted prescription; and argue that the plaintiff and the mineral claimants from Gibson are estopped to assert that the pooling agreement does not have the effect therein declared.
The plaintiff and the vendees from Gibson, on the other hand, claim that acknowledgment sufficient to interrupt prescription results only from specific agreement between the landowner and the mineral owner and cannot be implied as between Gibson and the Thompsons in this case, since the Thompsons signed the pooling agreement several weeks after Gibson had signed, out of his presence, without his consent, and even without knowledge on his part that the Thompsons were in any way involved. They make the further argument that even if the pooling contract could be treated as an agreement between Gibson and the Thompsons, it fails as an acknowledgment sufficient to interrupt prescription because of the absence of identity of the parties, description of the property intended to be affected, and mention of the servitude claimed to be acknowledgedso that, fraud aside, the contract is vitiated by error.
Under the express provisions of the LSA-Civil Code, there must be at least two parties to every contract, Articles 1765 and 1798; "the next requisite to its validity is their consent", Article 1797, for "no contract is complete without the consent of both parties", Article 1766, since "it is the common intent of the partiesthat is, the intention of allthat is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract." Article 1945. (Emphasis ours.) A review of the jurisprudence reveals that the Court has consistently applied the test of intent of the party against whom acknowledgment was pleaded in determining whether interruption of prescription has taken place. See Frost Lumber Industries v. Union Power Co., Inc., 182 La. 439, 162 So. 37, containing an exhaustive analysis of prior jurisprudence on the subject; Bremer v. North Central Texas Oil Co., Inc., 185 La. 917, 171 So. 75; Goldsmith v. McCoy, 190 La. 320, 182 So. 519; Spears v. Nesbitt, 197 La. 931, 2 So.2d 650.
In the case of Achee v. Caillouet, 197 La. 313, 1 So.2d 530, it was contended that a mineral lease, for a primary term extending beyond the date when prescription *209 would have accrued on a mineral servitude affecting the property, signed by both the landowner and the mineral owner, was a joint lease; and as such it constituted an acknowledgment on the part of the landowner, interrupting the prescription running in his favor. As in the case at bar, the defendants (mineral claimants) objected to the admission of parol evidence in connection with the lease, resting their case on the instrument itself. In disposing of this issue we pointed out that this Court has, on numerous occasions, sanctioned the admission of parol evidence to ascertain the intention of a landowner under such circumstances; and, in concluding that the landowner (Achee), upon signing the lease contract, did not intend to interrupt prescription, this Court observed that according to the undisputed testimony in the record, "There was no consultation, understanding or agreement between Achee and Caillouet, neither knowing the other, relative to the lease or its amendments. The instruments were signed by the parties at different times and places, out of the presence of each other. * * * Caillouet's name was not mentioned at any time * * * Achee did not know or contemplate that Caillouet was expected to sign the lease or would be asked to sign * * *." 197 La. at page 319, 1 So.2d at page 532. On rehearing, after a careful review of our jurisprudence on the subject of interruption by acknowledgment, we reaffirmed our former judgment, stating again the principle that "an acknowledgment of the rights of the owner of the servitude does not interrupt the running of prescription so as to make it run anew unless the acknowledgment is made with the purpose and intention that it shall have that effect, and that such purpose and intention must clearly appear." 197 La. at page 330, 1 So.2d at page 536. (Emphasis supplied.) We also noted that it would be contrary to reason to impute to the fact of Achee's signature of the lease, evidence of a purpose and intention on his part to renew the servitude for a full ten year term, since it was clearly against his interest to do so. 197 La. at page 333, 1 So.2d 530.
According to the facts of this case, it is clear that there was no privity of contract between Gibson and the Thompsons. The record shows that during the year 1943 and prior thereto, the plaintiff had acquired oil, gas and mineral leases affecting certain lands, including the ten-year lease from Gibson and his mineral transferees dated February 23, 1943, the validity of which is sought to be upheld in this proceeding. At the time there was no order of the Conservation Commissioner establishing spacing regulations and drilling units for the area, and the plaintiff undertook to form a 640 acre unit for the purpose of drilling and searching for gas by pooling the leases, to the extent that they granted the right to drill for gas, and having the lessors join with it in an agreement to that effect. This instrument, dated November 22, 1943, had apparently been signed by all the lessors, and the titles to the several properties were being examined by the plaintiff's attorneys when the possibility was discovered that the Thompsons still owned the mineral rights at issue because of Dhu Thompson's reservation of all the minerals when he sold the land to Gibson in 1915whereupon the plaintiff immediately sought and obtained an oil, gas and mineral lease from Dhu Thompson and his two sons. This lease, procured on December 13, 1943, was for a primary term of two years, one of the conditions being that the plaintiff would drill a well within one mile of the property leased and within a unit including it before April 1, 1944. Contemporaneously, the Thompsons affixed their signatures to a counterpart of the pooling agreement previously signed by Gibson and his mineral transferees. This instrument failed to identify the parties who would sign other than to name the plaintiff as lessee, and provided that "the undersigned owners of interests in and to" mineral rights would be referred to as "mineral owners." The evidence conclusively shows not only that the signatures of the Thompsons were affixed out of Gibson's presence, but without any knowledge thereof or consent on his part. See Kennedy v. Pelican Well Tool & Supply Co., 188 La. 811, 178 So. 359; English v. Blackman, 189 La. 255, 179 So. 306; Hightower v. Maritzky, 194 La. 998, *210 195 So. 518; and Baker v. Wilder, 204 La. 759, 16 So.2d 346. In the Wilder case, presenting for all intents and purposes a similar factual situation, where the names of the parties to the agreement were not written on the lease form but on a separate sheet, attached by paste at the top of the instrument, and there was no testimony to show that it was so attached when any of the parties signed, we observed that "so far as the instrument itself is concerned, there is nothing to indicate that the landowner knew who was to sign it after he signed * * *." 204 La. at page 771, 16 So.2d at page 350.
Moreover, the body of the pooling agreement on which the Thompsons base their claim not only failed to identify those designated as "mineral owners" in the property affected by the leases to be pooled, but described the property as a unitwithout specific description of the several tracts composing same or in any manner identifying the servitudes bearing on the several tracts. One of the express requirements of the LSA-Civil Code is that the acknowledgment must be of the right of the person whose title the debtor or possessor prescribes. Article 3520. Not only must such acknowledgment be specific, clear and concise, La Del Oil Properties v. Magnolia Petroleum Co., 169 La. 1137, 126 So. 684; Frost Lumber Industries v. Union Power Co., 182 La. 439, 162 So. 37; Kennedy v. Pelican Well Tool & Supply Co., 188 La. 811, 178 So. 359; Daggett on Louisiana Mineral Rights, Revised Ed., pp. 83-85, but the instrument must adequately describe the property to which it applies, James v. Noble, 214 La. 196, 36 So.2d 722, and must sufficiently identify the servitude as to which acknowledgment is sought to be made. Achee v. Caillouet, on Rehearing, 197 La. at page 332, 1 So.2d 530. Although mineral claimants may have in mind extending their mineral rights, they are powerless to do this without the consent of the landowners. White v. Hodges, 201 La. 1, 14, 9 So.2d 433.
It is conceded that the mineral servitude, created by Dhu Thompson through reservation of the minerals in the community property transferred to Gibson in 1915which would ordinarily have expired because of non-use in ten yearswas continued in effect (due to suspension during the minority of his children who inherited their mother's rights at her death) to March 6, 1944; and that there was never any drilling on the property during that period of time; consequently, on that date the servitude was extinguished by prescription resulting from nonusage, LSA-Civil Code, Articles 783, 789, 3546, whereupon the mineral rights reverted to the landowner, see Arent v. Hunter, 171 La. 1059, 133 So. 157, and numerous authorities cited on rehearing at pages 1073, and 161 respectively; Calhoun v. Ardis, 174 La. 420, 141 So. 15; Spears v. Nesbitt, 197 La. 931, 2 So.2d 650, and, under our jurisprudence, immediately became vested in Gibson's vendees. See Wolf v. Carter, 131 La. 667, 60 So. 52; St. Landry Oil & Gas Co. v. Neal, 166 La. 799, 118 So. 24, and cases cited therein; Jackson v. United Gas Pub. Serv. Co., 196 La. 1, 198 So. 633; and White v. Hodges, 201 La. 1, 9 So.2d 433.
The further contention advanced by the Thompsons that the running of prescription was interrupted by the drilling of a well on the integrated unit is untenable in view of the conclusions reached under the facts of this case and the pertinent jurisprudence.
The argument (not pleaded) that the plaintiff and the mineral claimants from Gibson are estopped to deny the positive averments of the pooling agreement is equally without merit. Estoppels are not favored in law; and, as pointed out by this Court in the case of Harvey v. Richard, 200 La. 97, 7 So.2d 674, "Whenever estoppel is pleaded as an element of a cause of action, it must be pleaded specifically, the burden of proving the facts upon which the estoppel is founded, as well as the affirmative showing that he was misled by the acts and forced to act to his prejudice, resting upon the party invoking the doctrine." 200 La. at page 103, 7 So.2d at page 677.
If there had been production during the primary term of plaintiff's mineral lease of December 13, 1943, with the Thompsons from the well drilled on the unitized tract, there might well be merit to the Thompsons' *211 contention that the plaintiff, with whom they contracted, should be held to the consequences of its action in confecting the agreement to pool the various leases, including the Thompson lease; but the facts are that when gas was finally produced in 1949, the lease with the Thompsons had terminated under its own provisions. However, the Thompsons' rights would not be founded on estoppel, but would arise under the contract.
For the reasons assigned, the judgment of the district court is reversed and set aside; and it is now ordered, adjudged and decreed that the mineral reservation or servitude created under the deed from Dhu Thompson to J. M. Gibson dated March 30, 1915, recorded in Conveyance Book BB at Page 266, as corrected by that instrument dated June 9, 1919, recorded in Book JJ at Page 227, of the Records of Lincoln Parish, Louisiana, is extinguished; and it is further ordered, adjudged and decreed that the oil, gas and mineral lease, dated February 23, 1943, affecting the East Half of the Southwest Quarter of the Southeast Quarter (E½ of SW¼ of SE¼), and the Southeast Quarter of the Southeast Quarter (SE¼ of SE¼) of Section 36, Township 19 North, Range 3 West, and the South Half of the Southwest Quarter (S½ of SW¼) of Section 31, Township 19 North, Range 2 West, Lincoln Parish, Louisiana, executed by J. M. Gibson and his mineral vendees in favor of the plaintiff, recorded in Oil and Gas Book 31 at Page 158, Records of Lincoln Parish, is declared valid and effective. All costs of these proceedings are to be borne by the defendants Dhu Thompson, Lanier Thompson and Lea S. Thompson.
LE BLANC, Justice (dissenting on rehearing).
I am unable to subscribe to the present opinion rendered on this rehearing. I adhere to the views expressed in the original opinion and wish to add these following observations:
The point on which a change has been produced in the judgment is that when Gibson, the landowner, signed the pooling agreement which was subsequently signed by his mineral transferees and also by the Thompsons, he intended only to acknowledge the mineral rights of his transferees and did not intend to acknowledge those of the Thompsons and thereby interrupt the running of prescription against the latter.
It is a fact that Gibson did testify to that effect but certainly that is not what the pooling agreement which he signed, reflects. The agreement contained no reservation as to anyone and on the contrary it specifically stated that it was an agreement between the Arkansas Louisiana Gas Company "and the undersigned owners of interests in and to the oil, gas and other mineral rights on, in and under and that may be produced from the lands herein below described, said owners being referred to as `Mineral Owners'." (My emphasis.) Consequently, from that language anyone having anything to do with, or interested in, that agreement had to anticipate that it would be signed by all those having any mineral rights in the land in the pooled area of 640 acres included in which was the land with the Thompsons' mineral rights.
Article 1945, as pointed out in the present majority opinion, is the proper article of our LSA-Civil Code to be consulted in construing a contract according to the intention of the parties and, as further pointed out, in the fourth paragraph of that article, it is the "common intent * * * that is, the intention of all [the parties] that is to be sought for;" and "if there was a difference in this intent, there was no common consent and, consequently, no contract." But at the same time, we should not overlook the third paragraph of that same article in which it is prescribed "That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences; * * *." Certainly the words in the agreement under consideration in this case appear to me to be "clear and explicit" and it can hardly be contended that they lead to any "absurd consequences".
In view of the wording of the contract and the mention therein made of who was to sign it, it seems unimportant to me whether the names were inserted in the body of the instrument or not. Throughout the *212 document it is made clear by the wording that all interested parties would be asked to sign the covenants therein contained and, in my opinion, when anyone who was asked to be a party to it signed it, he did so with the understanding that any other party, with a recorded mineral right or interest in any of the lands in the pooled area, would also sign. If he had any misapprehensions whatsoever, he should have withheld his signature until he had investigated from the public records who the owners of the mineral rights were and on ascertaining that there were some whose rights might have adversely affected his, he should have made proper reservation as to these.
The case of Achee v. Caillouet, 197 La. 313, 1 So.2d 530, 532, cited in the prevailing opinion, is not in my opinion authority on this point because from a mere reading of the opinion it cannot be said whether the language of the joint lease therein referred to bore any resemblance to the wording of the pooling agreement in this case or not. In the opinion it is stated: "Caillouet's name was not mentioned at any time, nor was it stated that any person other than Achee would be asked or permitted to sign the instruments." In this case, as I have already shown, the agreement itself conveyed the information that it was to be signed by owners of the mineral rights and interests in the pooled lands and by consultation of the Conveyance records of the Parish it would have been made apparent who all these owners were.
I think it should be borne in mind that Gibson is not a party to this suit and that he has no longer any mineral rights or interests in the 140 acres in which the Thompsons own their interest. He stands neither to gain nor lose anything in this law suit. The proceeding was instituted by the Arkansas Louisiana Gas Company. That company, through its officers and agents, provoked and engineered all transactions which led to this litigation. Its agents and attorneys are the ones who prepared the pooling agreement and obtained the signatures of all the parties thereto, including Gibson and the Thompsons, and in my judgment it comes with poor grace on its part to endeavor, through the testimony of a 79 year old and practically illiterate Negro (and I say this with all due respect to his race) to now repudiate its solemn obligations to all parties to its agreement.
NOTES
[1] The cash value of the mineral rights in dispute is far in excess of the sum of $2000 and therefore this court is vested with appellate jurisdiction of the case.
[2] Act 232 of 1944 which is now incorporated in LSA-R.S. 9:5805 did away with the suspension of prescription in favor of major co-owners. That Section of the LSA-Revised Statutes was further amended by Act 510 of 1950 which does away with the suspension of prescription as to minors.