154 So.2d 239 (1963)
HUMBLE OIL & REFINING COMPANY and Tennessee Louisiana Oil Company, Plaintiffs and Appellees,
v.
Leon BOUDOIN, Defendant and Appellant, Arceneaux J. Boudoin et al., Defendants and Appellees.
No. 710.
Court of Appeal of Louisiana, Third Circuit.
January 28, 1963.
On Rehearing April 22, 1963.
Rehearing Denied June 12, 1963.
*240 Plauche & Stockwell, by Oliver P. Stockwell, Lake Charles, for defendant-appellant.
Bernard J. Caillouet and W. J. McAnelly, Jr., David Parkway, New Orleans, for plaintiffs-appellees.
Jones & Jones, by J. B. Jones, Jr., and Jerry G. Jones, Cameron, C. A. Miller, Jr., Lake Charles, for defendants-appellees.
Before CULPEPPER, FRUGE and HOOD, JJ.
Before TATE, FRUGE, SAVOY, HOOD and CULPEPPER, JJ.
HOOD, Judge.
This is a concursus proceeding instituted by Humble Oil & Refining Company and Tennessee Louisiana Oil Company to determine the ownership of certain funds, representing payments attributable to a mineral royalty interest affecting and relating to the following described land in Cameron Parish, Louisiana, to-wit:
The South Half of the Southeast Quarter (S ½ of SE ¼) of Section Eight, less and except a strip of land two chains wide off the East side thereof, in Township 14 South, Range 6 West, containing 76.06 acres.
The above-described land was included in a 353.65 acre unit created by the Department of Conservation of the State of Louisiana. Gas and condensate have been and are being produced from that unit, and the royalties allocable to an undivided 11/24ths interest in the tract of land hereinabove described have been and are being deposited in the Registry of the Court by plaintiffs, as operators of the unit, who allege that there *241 is a dispute among some of the defendants as to the ownership of these funds. Leon Boudoin is one of the defendants named in this suit, and all of the other defendants are referred to herein as the "Heirs of Mrs. Irma Boudoin." All of the funds in dispute here are claimed by Leon Boudoin, on the one hand, and by the Heirs of Mrs. Irma Boudoin, on the other. The ownership of these funds must be resolved by determining who owns the disputed interest in the above-described land.
Leon Boudoin claims ownership of the entirety of that tract. The Heirs of Mrs. Irma Boudoin concede that he owns an undivided 13/24ths interest in it, but they claim that they are the owners in indivision of the remaining 11/24ths interest in such property.
After trial on the merits, judgment was rendered by the trial court rejecting the demands of Leon Boudoin, recognizing the Heirs of Mrs. Irma Boudoin as owners in indivision of an 11/24ths interest in the above-described property and ordering the Clerk of Court to pay to the last mentioned defendants the funds which have been deposited in the Registry of the Court. Defendant, Leon Boudoin, has appealed from that judgment.
The trial judge assigned excellent written reasons for judgment, in which he accurately and concisely stated the pertinent facts and we think he correctly set out the legal principles applicable to those facts. We, therefore, adopt the portions of his opinion which are hereinafter quoted as our own. With reference to the facts presented here, the trial judge said:
"On January 21, 1861, Pierre B. Boudoin, Sr., ancestor of all the defendants, acquired by patent from the State of Louisiana, the South Half of the South Half of said Section Eight, which included the tract of land in dispute and first described hereinabove. At the time of his said acquisition, Pierre B. Boudoin, Sr., was married to and living with Mrs. Irma Boudoin, born Primeaux. Mrs. Irma Boudoin died in 1862 and was survived by the following children, issue of her marriage with Pierre B. Boudoin, Sr.: Agglia Boudoin Benoit, Ursin Boudoin, Amelia Boudoin Nunez, Marie Emilie Boudoin Miller, Pierre B. Boudoin, Jr. and Marie Boudoin Conner. After the death of his first wife, Pierre B. Boudoin, Sr., remarried, and there were six children issue of his second marriage, one of whom was the defendant, Leon Boudoin. The several defendants in the case who assert claims contrary to Leon Boudoin are descendants of Mrs. Irma Boudoin, first wife of Pierre B. Boudoin, Sr., and they are also descendants and heirs of all of the children of her marriage with Mr. Boudoin, Sr., except Pierre B. Boudoin, Jr., as the last named quit-claimed his interest in the tract in dispute to Leon Boudoin by deed dated January 31, 1938.
"On June 17, 1908, which was after the second marriage of Pierre B. Boudoin, Sr., he executed and delivered a deed, with general warranty, to his son, Leon Boudoin, purporting to convey the entire Southeast Quarter of said Section Eight, for which Leon Boudoin paid his father the sum of One Thousand ($1,000.00) Dollars cash. This deed purported to cover the entirety of the Southeast Quarter which, of course, included the tract in dispute as well as the North Half of the Southeast Quarter of said Section Eight, which is not involved in the dispute in this concursus proceeding.
"Pierre B. Boudoin, Sr., died in 1909, and all of his children and heirs, or their representatives, accepted his succession simply and unconditionally, taking possession of other properties left by Mr. Boudoin, Sr., upon his death. Since delivery of the deed to him in 1908, Leon Boudoin has executed various instruments, which have been recorded in the Conveyance Records of Cameron Parish, purporting to cover the entirety of the Southeast Quarter of said Section Eight, or portions thereof. One such instrument was a deed to Alcide Conner on February 19, 1910, describing the entire Southeast Quarter *242 of said Section Eight, and reacquisition by Leon Boudoin from Alcide Conner on September 9, 1913, purporting to cover the entire Southeast Quarter of Section Eight, less and except the strip, two chains wide, on the east end thereof."

* * * * * *
"It is evident, at the outset, that the South Half of the Southeast Quarter of said Section Eight, having been acquired during the marriage of Mr. Boudoin, Sr., and his first wife, was a part of the community of acquets and gains that existed between them and that, upon the death of his first wife, Mrs. Irma Boudoin, an undivided one-half interest in said land descended to and was owned by the six children of their marriage, subject to the usufruct granted by law upon said undivided one-half interest to her surviving husband, Mr. Boudoin, Sr. Consequently, the six children of the first marriage, or their legal heirs, became owners of an undivided one-half interest in the tract of land in dispute and are still the owners of that interest therein, unless they have been divested of title thereto or unless they are estopped, in some manner provided by law, from asserting their claims to the ownership thereof. We begin, therefore, consideration of the evidence and issues in this case with the conclusion that, immediately after the purchase by Leon Boudoin from his father on June 17, 1908, Leon Boudoin was vested with title to an undivided one-half interest in the South Half of the Southeast Quarter of said Section Eight, and the other undivided one-half interest therein was vested in the six children of Mrs. Irma Boudoin."
On the basis of these facts Leon Boudoin contends primarily that when the other defendants accepted the succession of Pierre B. Boudoin, Sr., they became bound by the warranty of title contained in the 1908 deed from that decedent to Leon Boudoin, and that said defendants are now estopped from denying or questioning Leon Boudoin's title to the property conveyed by that deed. In the alternative, Leon Boudoin contends that he has acquired title to the property by prescription of ten years acquirendi causa. The trial judge rejected both of these contentions and on this appeal the appellant, Leon Boudoin, contends that the court erred in doing so.
The law is well settled that when heirs accept the succession of their ancestor simply and unconditionally, they become bound by his warranty of title to such an extent that they are estopped to deny the full effect of the warranty or to assert ownership of the property affected by that warranty. See LSA-Civil Code Articles 1013, 1423 and 2008; Stokes v. Shackleford, 12 La. 170; Smith v. Elliot, 9 Rob. 3; Cochran v. Gulf Refining Co. of Louisiana, 139 La. 1010, 72 So. 718; Griffing v. Taft, 151 La. 442, 91 So. 832; Berry v. Wagner, 151 La. 456, 91 So. 837; Soule v. West, 185 La. 655, 170 So. 26; Cook v. Martin, 188 La. 1063, 178 So. 881; White v. Hodges, 201 La. 1, 9 So.2d 433; Rigdon v. Holland, La.App. 2 Cir., 50 So.2d 835.
In this case when the heirs of Pierre B. Boudoin, Sr., accepted his succession simply and unconditionally, they became bound by his warranty of title to Leon Boudoin to such an extent that they would be estopped to deny the full effect of that warranty or to assert any ownership of the property affected by it, if such estoppel properly can be invoked in this case.
At the time of the sale by Mr. Boudoin, Sr., the vendor owned only an undivided one-half interest in the South Half of the Southeast Quarter of said Section Eight, and therefore, he conveyed only that interest to Leon Boudoin. In executing the deed to his son purporting to convey the entirety of said property with full warranty of title, Pierre Boudoin, Sr., committed a legal fraud upon the children of his first marriage, who owned an undivided one-half interest in the property so conveyed. In view of this legal fraud, a duty was imposed upon Pierre Boudoin, Sr., to restore to the Heirs of Mrs. Irma Boudoin the property of which they had *243 been wrongfully divested or its value. This obligation to restore to the children of his first marriage an undivided one-half interest in the disputed tract, or its value, was binding upon him at the time of his death in 1909, and that obligation was assumed by all of his heirs, including Leon Boudoin, when they accepted his succession.
In our opinion, the obligation of Mr. Boudoin, Sr., to restore to the children of his first wife the property of which they had been wrongfully divested was primarily an obligation to restore the property in kind, if possible, or to pay damages if restitution in kind could not be made. It follows, therefore, that Mr. Boudoin, Sr., would have been estopped from asserting title to the property which he was obligated to restore to the heirs of Mrs. Irma Boudoin.
In accepting the succession of Pierre B. Boudoin, Sr., therefore, his heirs assumed two conflicting or inconsistent obligations relating to the property here in dispute, namely: (1) the obligation to warrant the title to the entirety of such property to Leon Boudoin, and (2) the obligation to restore an undivided interest in the same property to the six children of Mr. Boudoin, Sr.'s first marriage, or their heirs or assigns. We think the heirs of Pierre B. Boudoin, Sr., also became subject to two inconsistent estoppels: (1) estoppel from denying the effect of the warranty to Leon Boudoin or to assert title to said property as against the claims of the latter, and (2) estoppel to oppose the claims of the Heirs of Mrs. Irma Boudoin relating to this property or to assert title to it as opposed to their claims. These two inconsistent obligations were assumed by, and the conflicting estoppels applied to, all of the heirs of Pierre B. Boudoin, Sr., including Leon Boudoin as well as the other defendants in this suit. Since they are inconsistent and it would be impossible to fulfill both, the question is presented of whether both obligations and estoppels are cancelled, or, if not, which should be enforced.
The trial court in disposing of this issue said:
"When Leon Boudoin succeeded to the rights and obligations of his father, by acceptance of his succession, he became bound by his father's obligations to the heirs of the first marriage, and such rights as he acquired under the deed from his father, with general warranty, might be considered as extinguished by confusion by the obligation imposed upon him to return an undivided one-half interest to the heirs of the first marriage and thus prevent any loss of their rights. A similar view must be taken with respect to the obligation of warranty imposed upon the heirs of the first marriage when they accepted their father's succession and normally would be bound to honor the warranty made by their father to Leon Boudoin, even though contrary to their own rights. An attempted discussion of equities leads only to the conclusion that both estoppels urged in this case cannot be invoked and, having arisen in the same manner, (through the simple and unconditional acceptance of the succession of their father), must be held to be equal in every respect. The lack of equities involved only serves to confirm the conclusion that application of one or the other of the estoppels urged would result in no greater injustice to one than to the other. This situation involves the so-called doctrine of estoppel against estoppel, with the result that the two estoppels destroy or neutralize each other. See 19 Am.Jur. 154; Chretien v. Giron, 115 La. 24, 38 So. 881; Sealy et al. v. Lake, 243 Ala. 396, 10 So.2d 364; Astor v. Astor, Fla. App., 120 So.2d 176. Accordingly, the pleas of estoppel are denied, leaving the ownership of the undivided interest in the property in dispute unaffected thereby."
We think the conclusion reached by the trial court is correct, and for the reasons hereinabove assigned we hold that the pleas of estoppel filed herein were properly denied, and that neither Leon Boudoin nor the other defendants are estopped from asserting title or ownership of the property here in dispute. See also 10 C.J.S. Estoppel *244 § 12; Succession of Benton, 106 La. 494, 31 So. 123, 59 L.R.A. 135; and Hodges v. Long-Bell Petroleum Company, 240 La. 198, 121 So.2d 831.
Leon Boudoin contends, however, that he has affirmatively pleaded estoppel in this case, but that the remaining defendants have not properly done so, and accordingly, that their argument on this appeal that the two conflicting estoppels destroy or neutralize each other should not be considered. He points out that Article 1005 of the LSA-Code of Civil Procedure requires that a plea of estoppel be affirmatively pleaded in the answer. We find that the Heirs of Mrs. Irma Boudoin allege in their answer that "Leon Boudoin was well aware of the fact that your defendants were the owners of an undivided interest in said property, and has taken no steps to openly evict your defendants therefrom, and is, therefore, estopped to claim title to the undivided interest of your defendants, which estoppel is specifically pleaded by your defendants in bar to the claim of Leon Boudoin to the title of said property." Although the grounds alleged in the answer as a basis for the plea of estoppel are somewhat different from those urged here, we think they are related closely enough to place the other parties to the suit on notice of that affirmative defense, and accordingly, that the plea of estoppel filed by these defendants should be considered.
Leon Boudoin contends, in the alternative, that he has acquired title by prescription of ten years acquirendi causa. The four essential elements of a valid title by the acquisitive prescription of ten years are good faith in the possessor, a just title, continuous and uninterrupted possession for a period of ten years, and an object that may be acquired by prescription. See LSA-Civil Code Article 3479. The trial judge found, correctly we think, that Leon Boudoin was in good faith, that the title which he acquired in 1908 on its face was sufficient to transfer ownership, and that the undivided interest in the tract of land which is here in dispute is an object that may be acquired by prescription. The remaining question to be considered is whether his possession, if any, of the property here at issue has been sufficient to maintain a ten year prescriptive title.
The evidence shows that a road traverses the Southeast Quarter of said Section Eight, which road was constructed on a narrow ridge which runs in a northwesterly direction from the east line to the west line of that quarter section. This road is located entirely in the North Half of the Southeast Quarter of the section, and there is no question about the fact that all of the South Half of that quarter section, which is the tract of land affected by the dispute in this case, lies south of this roadway. All of the property in that section lying south of the road is deep marsh land, except for a part of the ridge on which the road was built and a small area adjacent to the road and near the east line of the section. Some buildings and fences are located on the land lying immediately north of this road, and the evidence establishes that since 1908 Leon Boudoin has maintained actual and continuous possession of the land on which these buildings and fences are located, the area so possessed by Leon Boudoin being entirely in the North Half of the Southeast Quarter of Section Eight.
The testimony pertaining to the nature and extent of any actual possession exercised by Leon Boudoin south of the road is conflicting. Insofar as evidence tending to show physical possession of the land is concerned, we think it has been established that Leon Boudoin or one of his sons has trapped for fur bearing animals on the land lying south of the road since at least 1916, that about 20 years ago Leon Boudoin had some ditches cut in the area south of the road to facilitate trapping, and that about 25 years ago he enclosed a small area of land south of the road with a fence and used it for a pasture. The opinions expressed by the witnesses as to the size of the area enclosed by this fence varied from 2 to 20 acres, and the evidence is inconclusive as to how long the fence remained *245 there. The evidence further shows that until a very few years ago it was common practice for trappers to conduct their trapping operations on any land in that area, regardless of who owned it, so the fact that Leon Boudoin trapped on land lying south of the road would not in itself indicate that he was possessing that land as owner.
We quote with approval the following additional findings of the trial judge with reference to acts of possession relating to the area south of the above-mentioned road:
"The testimony of the witnesses named above, with proof of the execution and recording of several instruments granted by Leon Boudoin including a right of way for the road, a right of way for a drainage ditch and several mineral leases, with proof of payment of taxes on all of the property by Leon Boudoin since his deed of acquisition, substantially covers all of the evidence submitted with respect to possession. Aside from any possession which may be asserted by Leon Boudoin to the extent of the limits of the property described in his deed, as a result of his actual and continuous possession of the property north of the road, evidence of his alleged possession in the South Half of the Southeast Quarter of said Section Eight (the tract involved in the dispute) is inconclusive. The fenced pasture south of the road probably would have comprised a portion of the South Half of the Southeast Quarter according to the testimony of Pierre Boudoin and Mrs. Jack Benoit, who described it as comprising approximately twenty acres, but testimony of the other witnesses described the pasture as containing from about two to six acres in the area, leaving considerable question about the encroachment of the pasture into the South Half of the Southeast Quarter. Witnesses for Leon Boudoin indicated the pasture remained fenced for approximately twenty-five years, whereas the other witnesses stated it was only from three to five years. There was testimony that the marsh area south of the road was trapped for fur bearing animals and, to facilitate trapping, the ditch was cut on three sides of the property south of the road in about 1942. Other than as set forth, the South Half of the Southeast Quarter was generally used by many people in the area as an open range for their cattle. There was some testimony about brief dynamiting operations conducted by an oil company and the leasing of a duck blind about ten or twelve years ago, but the location of those activities, though south of the road, was not definitely shown to be within the South Half of the Southeast Quarter."
An important question presented with reference to Leon Boudoin's claim of ownership by acquisitive prescription is whether, according to the evidence presented here, his possession of the South Half of the Southeast Quarter of Section Eight has been sufficient to maintain a prescriptive title to that tract. The law provides that in order to maintain such a plea the possessor must have "held the thing in fact and in right, as owner," and that "the possession shall have been continuous and uninterrupted, peaceable, public and unequivocal." LSA-C.C. Article 3487. It is also settled that the possession necessary to acquire title to land by precription depends upon the nature and character of such land. The possession required to maintain a prescriptive title to marshlands is such possession as is practicable, is commensurate with the nature of the land, its chief value and the extent of operations on the land which the character of the said land and surroundings may reasonably permit. Snelling v. Adair, 196 La. 624, 199 So. 782; Scott v. Brown Paper Mill Co., La.App. 2 Cir., 174 So. 212; Acosta v. Nunez, La.App. Orl., 5 So.2d 574 (affirmed, 203 La. 275, 13 So. 2d 860).
The trial judge concluded that the possession exercised by Leon Boudoin with respect solely to the South Half of the Southeast Quarter of Section Eight was not sufficient to constitute the basis for a prescriptive title, and we think the evidence supports that conclusion.
*246 Leon Boudoin, however, invokes application of the legal principle that when a person has a title to contiguous tracts of land, and actually possesses a part of the property included in his title with the intention of possessing all of it, he is presumed to have possessed according to the title and to the full extent of its limits.
The general rule in this state is that where contiguous lands, constituting in effect one tract, are acquired under the same title, the actual possession of a part thereof is equivalent to possession of all the property within the limits described in the deed. LSA-C.C. Articles 3437 and 3498; Texas Company v. O'Meara, 228 La. 474, 82 So.2d 769; Leader Realty Co. v. Taylor, 147 La. 256, 84 So. 648; Smith v. Southern Kraft Corporation, 202 La. 1019, 13 So.2d 335. In the instant suit, however, the Heirs of Mrs. Irma Boudoin contend that this general rule should not be applied, because Leon Boudoin has never possessed any part of the property which is affected by the prescription he now urges.
We find it unnecessary to determine this issue, because we believe the trial judge has correctly rejected Leon Boudoin's plea of acquisitive prescription on another ground, that is, that his possession (assuming that his possession of the North Half extends to and includes the property here in dispute) was not sufficient to apprise his co-owners of the fact that he was possessing the disputed tract as owner.
The rules applicable to that phase of this case, we think, were clearly set out in the case of British American Oil Producing Company v. Grizzaffi, La.App. 1 Cir., 135 So.2d 559 (Cert. denied), as follows:
"As correctly pointed out by learned counsel for the Austins and conceded by counsel for the Robinsons, it is the well settled jurisprudence of this state that owners in indivision cannot acquire by prescription the right of their co-owners in and to property held in common. Litton v. Litton, 36 La.Ann. 348; Simon v. Richard, 42 La.Ann. 842, 8 So. 629; Dew v. Hammett, 150 La. 1094, 91 So. 523; Hill v. Dees, 188 La. 708, 178 So. 250; Arnold v. Sun Oil Company, 218 La. 50, 48 So.2d 369; Atlantic Refining Co. v. Golson, La. App., 127 So.2d 341.
"It is likewise admitted by all concerned that an exception to the foregoing rule is recognized in those instances wherein the adversely possessing co-owner gives notice to his owner or owners in common that he intends to possess contrary to the common interest. Under such circumstances one owner in common may prescribe against a party owning in indivision with him provided such possession be clearly hostile and notice be given thereof. Ethredge v. Watts, 137 La. 686, 69 So. 95; Liles v. Pitts, 145 La. 650, 82 So. 735; Gill v. Robinson, 11 Orleans App. 226 and Arnold v. Sun Oil Company, 218 La. 50, 48 So.2d 369.
"In assessing factual circumstances to determine whether a particular case falls within the exception rather than the general rule it has been held that mere occupancy, use, payment of taxes and similar acts of possession will not suffice to constitute notice of adverse possession to an owner in common. Lee v. Jones, 224 La. 231, 69 So.2d 26; Alba v. Smith, 228 La. 207, 81 So.2d 863; Hodgeson v. McDaniel, 233 La. 180, 96 So.2d 481; Banks v. Yarborough, La.App., 104 So.2d 283.
"Registry of a new title does not ipso facto constitute notice to a co-owner that the possession of his owner in common has become adverse. John T. Moore P. Co. v. Morgan's Louisiana & T. R. & S. S. Co., 126 La. 840, 53 So. 22.

* * * * * *
"It is the settled jurisprudence of this state that a co-owner has the right to use the property held in common *247 with others for the purposes for which it is destined such as cultivation of farm land, Stinson v. Marston, 185 La. 365, 169 So. 436; and he need not pay rent for such use. Juneau v. Laborde, 228 La. 410, 82 So.2d 693.
"Unless the possession, use and occupancy exercised by one co-owner be shown to have been intended by him to be adverse to his co-proprietor and clear and precise notice thereof imparted to the co-owner, such use and occupancy is presumed to be for the benefit of all persons owning an interest in the property. Demarco v. Duplantis, La.App., 88 So.2d 735.
"The rationale of the foregoing rule is that since all co-owners have the mutual right to use, occupancy and possession of property held in common provided such use, occupancy and possession is not to the exclusion of the other co-owners, either co-owner may possess or use the entire property and any co-owner who is dissatisfied with such arrangement is entitled to relief therefrom in the form of an action of partition. Loret v. Fugler, La.App., 71 So.2d 384; Demarco v. Duplantis, La.App., 88 So.2d 735."
As already pointed out, the deed to Leon Boudoin purported to convey to him the entire Southeast Quarter of Section Eight. By that deed he became vested with valid title to the entirety of the North Half of that quarter section, but he did not acquire the entirety of the South Half. He has possessed only the North Half, which he has owned completely since 1908, and he contends that under the provisions of LSA-C.C. Articles 3437 and 3498 possession of that part of the quarter section is equivalent to possession of all of it, including the property here in dispute.
The trial judge, in holding that the possession exercised by Leon Boudoin was not sufficient to apprise his co-owners of the fact that he was possessing or claiming the property here in dispute as owner, said:
"* * * there is no evidence indicating that the heirs of Irma Boudoin had any knowledge in 1908, or for that matter for many years subsequent thereto, of the fact of their co-ownership with Leon Boudoin in the South Half of the Southeast Quarter. In the case at bar, Leon Boudoin, without actual title to an outstanding undivided interest in the tract in dispute, urges title thereto by prescription. Even though the legal presumption is in his favor with respect to beginning his possession as master and owner, his possession of the tract in dispute must be such as to give the entire world notice of his adverse claim. It must be conceded that certain acts of possession might be construed to give notice to third parties which would not constitute notice to co-owners, because co-owners have mutual and non-exclusive rights of possession, and, in consideration of this phase of the problem, we are not concerned with presumptions, good or bad faith or actual knowledge of the fact of co-ownership. When one seeks to prescribe against an actual owner, whose ownership carries with it constructive possession to the extent of his title, the person seeking to prescribe must overcome the title pretentions of the actual owner. A person seeking to prescribe is urging a divestiture of title, so he confronts the title as it actually exists. If his adversaries have title to an undivided interest in the land, whether or not he is aware thereof, that is the title he seeks to prescribe against, and his acts of adverse possession must be judged accordingly. Assuming, arguendo, that Leon Boudoin exercised acts of possession on the South Half of the Southeast Quarter, it must be concluded that the same were not sufficiently adverse to his co-owners in that tract to apprise them of the adverseness of his claims. His acts of possession, with respect to the tract in dispute, were such as might properly be exercised by any co-owner, without advantage to one or loss to the other *248 by the exercise thereof, in the absence of convincing evidence that the possession was not only adverse, but hostile, to the true owners. These principles, and their application, are supported by decisions cited above, and by the decision, just published, in British American Oil Producing Company et al. v. Grizzaffi et al., La.App., 135 So.2d 559."
Counsel for Leon Boudoin relies principally on the cases of Texas Company v. O'Meara, 228 La. 474, 82 So.2d 769, Land Development Co. of Louisiana v. Schulz, 169 La. 1, 124 So. 125 and Screen v. Trainor, 172 La. 51, 133 So. 359, in support of his argument that a prescriptive title has been made out. In our opinion, the O'Meara case is not applicable because the opposing claimants were not co-owners of the property involved there. In each of the other two cited cases, although the claimants were co-owners of the disputed tracts, we think the possession on which the claim of a prescriptive title was based was of such a nature that it clearly served as notice to the co-owners that the possessor was claiming the property as owner. In the Schulz case, for instance, the defendant fenced and cultivated the two lots there in dispute, she established a dairy and built a double cottage on them, and spent a considerable sum of money improving the property long before she could have relied on a plea of prescription. In Screen v. Trainor the possessor conducted turpentining operations on the land, which were described by the court as being "sufficiently extensive and patent to make it noticeable to anyone passing through the tract that * * * the land in contest, was possessed for turpentine purposes." The facts in the instant suit differ materially from those in the cited cases, and for that reason, we feel that the cases relied on by Leon Boudoin are not applicable.
We think the conclusions reached by the trial judge are correct, and accordingly, we hold that Leon Boudoin has failed to establish ownership by prescription of the 11/24ths interest in the property here in dispute.
For the reasons herein set out, the judgment appealed from is affirmed, and all costs of this appeal are assessed to appellant, Leon Boudoin.
Affirmed.

On Rehearing
CULPEPPER, Judge.
A rehearing was granted to reconsider the holding in our original opinion that Leon Boudoin and the six children of Pierre Boudoin's first marriage, (hereinafter referred to as the six heirs) by accepting their father's succession in 1909, subjected themselves respectively to estoppels which neutralized each other, thereby setting at large the estoppel of the said six heirs to deny the warranty of title contained in their father's deed to Leon Boudoin. We are now of the opinion that our original decision was erroneous in this respect. Although it is clear, and actually not disputed, that the said six heirs, by accepting their father's succession in 1909 estopped themselves to deny the warranty of title contained in their father's deed of 1908 to Leon Boudoin, we do not think that Leon Boudoin, by accepting his father's succession in 1909, subjected himself to any estoppel which neutralizes the effect of that affecting the six heirs.
A consideration of the nature of these two alleged estoppels is necessary. We will first discuss the estoppel affecting the six heirs. The law is well settled that when heirs accept the succession of their ancestor simply and unconditionally, they become bound by his warranty of title to such an extent that they are estopped to deny the full extent of the warranty. This is known as an estoppel by deed. In discussing *249 this type of estoppel in the case of Soule v. West, 185 La. 655, 170 So. 26, our Supreme Court said:
"The obligation of joint vendors to maintain the vendee in peaceable possession is an indivisible one, though their obligation to respond in money for the purchase price is divisible. Smith v. Elliot, 9 Rob. 3; Schultz v. Ryan, 131 La. 78, 59 So. 21, and cases there cited."
Thus the said six heirs, by accepting their father's succession in 1909, were estopped from asserting any claim against the title which their father warranted to Leon Boudoin. This estoppel was indivisible, i.e., each of the six heirs was estopped from asserting whatever interest he owned in the property.
Now let us examine the nature of the obligation assumed by Leon Boudoin through his acceptance of his father's succession in 1909. First, what was the father's obligation to the six heirs? When Pierre Boudoin executed the deed to Leon Boudoin in 1908, he attempted to sell the undivided interest which belonged to the six heirs, but insofar as their one-half interest is concerned, the sale was a nullity. LSA-C.C. Art. 2452 states that "The sale of a thing belonging to another person is null; it may give rise to damages, when the buyer knew not that the thing belonged to another person." Thus the sale did not affect the interest in the property owned by the six heirs.
What rights did the said six heirs have against their father as a result of this attempted sale? They certainly could not seek from him the return of their interest in the property. He never owned it. After the sale to Leon Boudoin, their father no longer owned even his own one-half interest. The only possible recourse which the six heirs had against Pierre Boudoin was to seek whatever money damages they had suffered by reason of this attempted sale of their property. Of course, the six heirs could have ratified the sale to Leon Boudoin and proceeded against their father for their share of the purchase price, but they did not do so in this case.
Therefore, when Pierre Boudoin died in 1909 the only cause of action which the six heirs had against him was a suit for damages for wrongfully attempting to sell their property. Pierre Boudoin had twelve children, six by his first marriage and six by his second. All twelve of these children, or their representatives, accepted Pierre's succession simply and unconditionally in 1909. By so doing, each became liable for his father's debts to the extent of his virile share of the estate. LSA-C.C. Art. 1013; Richard v. Cain, 168 La. 608, 122 So. 866; Dirmeyer v. O'Hern, 39 La.Ann. 961, 3 So. 132; Kelly v. Giles, 167 La. 287, 119 So. 51. Consequently, Leon Boudoin, by accepting his father's succession, became personally liable to pay one-twelfth of whatever damages had been suffered by the said six heirs by reason of their father's attempted sale of their interest in the property.
Thus we have a situation where the six heirs are estopped by an indivisible contractual obligation of warranty to claim any interest in the property as against the warrantee, Leon Boudoin. On the other hand, Leon Boudoin is not estopped by any warranty of title, or obligation to return to the six heirs their individed one-half interest, but is simply personally liable for his one-twelfth of whatever money damages the six heirs have suffered. The obligation of the heirs to warrant Leon Boudoin's title involves the law of contracts and titles, whereas the obligation assumed by Leon Boudoin arises out of a tort committed by Pierre Boudoin. There is no "estoppel against an estoppel" such that one neutralizes the other.
Actually, we are unable to rationalize how the actions or conduct of Pierre Boudoin, in attempting to sell the one-half interest of the six heirs, or the acceptance of his succession by Leon, created what in *250 legal terms can be classified as an "estoppel". Generally speaking, it may be said that estoppel is a bar which precludes a person and his privies from denying or asserting anything to the contrary of that which has, in contemplation of law, been established as the truth, either by the acts of judicial or legislative offices, or by his execution of a deed or his representations or conduct, express or implied. See 19 Am.Jur. 601, Verbo Estoppel, Sec. 2. The general purpose of estoppels is to require honesty, fair dealing and good faith by preventing a person from making contrary representations. 19 Am.Jur. 602, Verbo Estoppel, Sec. 4. Estoppels are generally classified as one of three kinds: (1) Estoppel by record, as for instance where a party files pleadings in a suit, he may be thereafter estopped to assert a contrary position, where the opposing litigant has relied on such pleadings to his detriment. See Staunton v. Vintrella, 223 La. 958, 67 So.2d 550. (2) Estoppel by deed, as for instance where a vendor warrants full title to the vendee, the vendor is estopped to thereafter assert an interest contrary to his warranty. See Gaines v. Crichton, 187 La. 345, 174 So. 666. (3) Estoppel "in pais" or equitable estoppel is a term applied to a situation where, because of some conduct on his part, a person is denied the right to assert or prove a certain fact, as for instance where a person has done or said something with the intent to influence the other, and the other has acted upon the faith of it to his detriment, the former is estopped to change his position. See Brock v. Black, Rogers & Co., 201 La. 1017, 10 So.2d 790.
In the present case there is clearly no estoppel by record. Likewise there was no estoppel by deed. When Pierre Boudoin executed this deed to Leon Boudoin in 1908, attempting to sell the undivided one-half interest which actually belonged to the said six heirs, they certainly did not declare or take the position that the heirs owned a one-half interest. On the contrary, they declared and represented that Pierre Boudoin owned the entire property and sold it to Leon. Therefore, we are unable to rationalize the contention that Pierre Boudoin or Leon Boudoin were estopped, by some declaration in the deed, from attacking the six heirs' ownership of one-half interest in the property. Furthermore, we fail to see how the situation gave rise to an estoppel "in pais". At no time did Pierre Boudoin or Leon Boudoin do any act, or fail to do any act, or make any representation for the purpose of inducing the six heirs to think the six heirs owned an interest in the property.
It may be that Pierre committed a tort against the six heirs, for which he may have been liable in damages, but this is an entirely different matter from an estoppel. Pierre Boudoin, Sr. was not estopped, nor was his succession estopped and clearly, Leon Boudoin, who accepted only his virile share of the succession's debts, is not estopped.
The point, at which we fell into error in our original opinion, was in stating that Pierre Boudoin, by attempting to sell the one-half interest of the six heirs, became obligated to return this interest to said heirs. We now perceive that Pierre had no legal duty to return to the heirs their interest in the property. He could not return it. He never owned it. After the sale to Leon he didn't even own his own one-half interest. Pierre's liability to the six heirs was solely for damages. Consequently this was the only liability of the succession to said heirs. By accepting the succession Leon Boudoin assumed only one-twelfth of this money obligation. He certainly did not and could not have assumed an obligation to return to the said six heirs their one-half interest in the property.
Estoppel, being an equitable doctrine, we deem it appropriate to discuss the equities. The evidence shows that Leon Boudoin purchased this property from his father in good faith, without any knowledge of the outstanding interest owned by the said six heirs. Leon paid $1,000 for the entire 160 acres which would mean that the 80 acres *251 in question was valued at $500 and the one-half interest of the six heirs at $250. It is reasonable to assume that the greatest damages which could have been claimed in 1909 by the said six heirs, as a result of the sale, amounted to the sum of $250. Leon Boudoin, through the acceptance of his father's succession, became personally liable for only his one-twelfth of this debt of $250. It would be manifestly unfair and inequitable to now hold in effect that instead of having to pay his one-twelfth, or the sum of about $20, he must give up the title to property which was worth $250 in 1908 and now has become very valuable because of the discovery of oil thereon.
Furthermore, we think it would be a most dangerous precedent to hold that the estoppel by warranty deed affecting the six heirs could be neutralized by a personal obligation to pay damages. A person who is examining the record title to realty should be able to rely on the well established doctrine of estoppel by deed, without the necessity of having to investigate the possibility of there being a personal obligation of some type to pay a money debt, which might offset the estoppel by deed.
Finally, we think there is applicable here the doctrine expressed by our Supreme Court in the recent case of Succession of Stokes Seals, La. 150 So.2d 13, in which the court stated:
"`The genius of our law does not favor the claims of those who have long slept on their rights and who, after years of inertia, conveying an assurance of acquiescence in a given state of things, suddenly wake up at the welcome vision of an unexpected advantage and invoke the aid of the courts for relief, under the effect of a newly discovered technical error in some ancient transaction or settlement.' Lafitte, Dufilho & Co. v. Godchaux, 35 La.Ann. 1161, 1163 See, Sun Oil Co. v. Roger, 239 La. 379, 118 So.2d 446."
In the instant case the six children of Pierre Boudoin by his first marriage, although all were of the age of majority when the property was sold to Leon Boudoin in 1908, have slept on their rights for about fifty years and, now that the property has become valuable through the discovery of minerals thereon, suddenly seek to take advantage of a discovered technical argument such as they have advanced here with reference to the issue of estoppel. During all of this time Leon Boudoin has lived on the adjoining 80 acres; he has assumed that he owned good title to the approximately 80 acres in dispute; he has paid taxes thereon; and the six heirs did not at any time during said fifty years give Leon Boudoin any reason to think that they were going to attack his ownership.
Having determined that the doctrine of "estoppel against estoppel" is not applicable here, the estoppel of the six heirs to assert any interest which they might own in the property is not neutralized, and is determinative of the issues herein. It is unnecessary for us to consider the remaining questions of possession, good faith, etc. pertaining to Leon Boudoin's plea of ten years acquisitive prescription. Those portions of our original opinion dealing with these latter issues are hence of no effect and our said original opinion will not be considered by this Court in the future as a binding precedent.
For the reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that the demands of the six children, or their representatives, of Pierre B. Boudoin, Sr. by his first marriage to Irma Primeaux, be rejected and Leon Boudoin is now recognized and decreed to be the owner of the following described land in Cameron Parish, Louisiana, to wit:
The South Half of the Southeast Quarter of Section 8 (S½ of SE¼ of Sec. 8) LESS AND EXCEPT a strip of land 2 chains wide off of the east side thereof, in Township 14 South, Range 6 West, containing 76.06 acres.
*252 All costs in the lower court, as well as the costs of this appeal, are assessed against the said appellees.
Reversed and rendered.
TATE, J., concurs with the result.
HOOD, J., dissents for reasons set out in the original opinion of this court.
TATE, Judge (concurring).
The writer concurs with the majority decision on rehearing.
To recapitulate, in 1908 Pierre Boudoin sold by warranty deed the entire subject property to Leon Boudoin, a son of his second marriage. Pierre, however, only actually owned a one-half interest in this property. The other half was owned in indivision by the six heirs of Pierre's first marriage, which had been terminated by the death of Pierre's first wife in 1862, some 46 years prior to Pierre's sale to Leon.
In our initial majority opinion herein (now the dissenting opinion), we held that Pierre was under a legal obligation to return to these six heirs, his children, the property really owned by them which Pierre had sold to Leon Boudoin.
We therefore held in our original opinion that, in 1909 when Leon Boudoin accepted his father's succession, he also accepted an obligation to restore to the six heirs, his half-brothers and half-sisters, the property of theirs which had been wrongfully sold to him by the father. The acceptance by Leon Boudoin of this counter-obligation thus cancelled out the obligation assumed by the heirs when they themselves had accepted the father's succession (which was, of course, to make good the title of Leon Boudoin, purchaser from their father by a warranty deed).
I frankly cannot find in this orginal result the unsettling consequences to the stability of titles which the present majority fears.
From a title examiner's point of view, there was an obvious defect in Leon Boudoin's title, namely, that he had never acquired a recorded title to the one-half interest owned in indivision by the six heirs rather than by his seller. Those relying on record titles, in my humble opinion, could not be substantially prejudiced by a holding which, as to such obviously defective titles, limited the Curative effect of the acceptance by heirs of a succession Only to those who are strangers to the succession. (As to the co-heirs, the status quo of before the illegal sale by their ancestor would simply be restored, by their mutual acceptance of the succession.)
The effect of the original majority ruling would thus not disturb the settled rule that heirs accepting their ancestor's succession become bound by his warranty of title. The effect of the ruling was to estop from claiming validation of their defective titles by such rule, only co-heirs still in possession of property wrongfully sold to them by their ancestor, and then only because upon their acceptance of their ancestor's succession such co-heirs became obliged to restore what they had improperly received from him before they could benefit by the other heirs' same acceptance of the same succession.
Likewise, in the absence of such inactivity affording a basis for a prescriptive title, I am unable to ascribe any legal effect to the circumstances that the six heirs waited many years before discovering and claiming the ownership of their interest in the land involved. "`It has long been a fundamental principle deeply embedded in our law and jurisprudence that title to realty cannot be established by waiver or by estoppel; for one can never be divested of his title to realty except in the manner prescribed by law,' such as by deed, inheritance, or prescription", Monk v. Monk, 243 La. 429, 144 So.2d 384, 387-388.
Nevertheless, I concur with the present majority result on rehearing simply because I have been unable to find any obligation imposed by law on the father to return to his six major children the property belonging *253 to them which the father had conveyed by a null sale. Under what seems to be the only pertinent statutory regulation of the matter, LSA-Civil Code Article 2452 (quoted in the majority opinion on rehearing), the sale of the six heirs' property by the father was a nullity; as the majority noted, the father was not under a legal obligation to return to the heirs property of theirs which he did not legally possess nor legally sell.
Thus, back in 1909 when Leon accepted the father's succession, the father's obligation to the six heirs did not include any duty to restore their property, because the father's sale to Leon in 1908 was a nullity and had conveyed nothing.
If at that time the father was nevertheless obligated to make good the six heirs' loss of title to their property, I would say that Leon's acceptance of such an obligation (be it divisible or indivisible) should estop Leon from claiming the benefit of the acceptance by the six heirs of their father's opposing counter-obligation to make good Leon's title to this same land. However, in 1909 when Leon accepted the father's succession, the heirs at that time had suffered no damage or loss by their father's attempted sale of their interest in the subject property, since the sale was a nullity and the six heirs still owned the property.
What concerns me somewhat with the present majority's scholarly analyses of estoppels and obligations, is that we may by resting our present majority decision so broadly, also encompass situations where a father is under a fiduciary or other duty to restore to his children property of theirs which is sold to a co-heir by the father when he is clothed with the legal or apparent authority to do so, or to make good any loss the children suffer thereby. In such situations,no matter what the technical classification might be of the duty of the father as divisible or indivisible or as personal or real, it seems to me that an obviously defective transfer by the father to a co-heir of the children's property should not be cured by these children's acceptance of the father's succession, whenever the co-heir has also, by accepting the same succession, accepted some sort of a counter-obligation to restore the property or to make the loss good.
If in the further application for rehearing our attention is directed to applicable legal principles by reason of which the father was at the time of his death under a duty to restore to the six major heirs their property which he had improperly sold to Leon Boudoin, or to make good any loss of title to the property that the heirs might sustain because of his action, then the writer will freely concede that he is in error in subscribing to the result reached by the present majority on rehearing.

On Further Application for Rehearing.
En Banc. Rehearing denied.
TATE, Judge (dissenting).
Following our judgment on rehearing, counsel for the heirs of Mrs. Irma Boudoin has filed an application for another rehearing.
In this application, counsel points out, correctly in my opinion, that the majority fell into error in stating that the 1909 sale was an absolute nullity, whereby the father Pierre sold to his son Leon property belonging to the heirs of the father's first wife, Mrs. Irma Baudoin, and that accordingly Pierre could be under no duty to return the property to these coheirs.
Under LSA-Civil Code Article 2452, it is true, a seller's sale of the property of another may be annulled, and in that case the buyer may have an action for damages if the buyer purchased in good faith. See LSA-Civil Code Articles 2505, 2506. However, subject to being nullified at the timely behest of the true owners and until it is so nullified, the buyer obtains certain rights both against the world and even against the true owners. See Barnhart v. Gulf Refining Co., 159 La. 509, 105 So. 602, containing a most dramatic illustration of this principle.
*254 What we overlooked in our opinion on rehearing is the quasi-contractual obligation set forth by LSA-Civil Code Articles 2302 and 2312 of him who has received what belongs to another to restore the thing received to the true owner (or instead its value, if the thing cannot be restored). Edward Levy Metals, Inc. v. New Orleans Public Belt R., 243 La. 860, 148 So.2d 580. This code-created obligation expressly includes the duty to restore immovable property to its true owner. Article 2312. Further, the obligation to pay the value instead of restoring the thing arises only if the obligor is unable to restore the thing itself. Article 2312; Kramer v. Freeman, 198 La. 244, 3 So.2d 609.
This, then, is the situation we have in 1909, just before the father Pierre Baudoin died:
Leon was under a quasi-contractual obligation to restore to its true owners (the heirs of Irma Baudoin), their property which his father Pierre had sold to him the year before. The father Pierre had sold it to his son Leon by a deed containing a general warranty. On suit by the heirs against Leon, he was therefore entitled to have his father Pierre, as vendor-warrantor, called into the suit to defend it, and Leon was further entitled to pray that the court decree against his warrantor the same judgment as was rendered against him in the principal action (Articles 378, 382, Code of Practice of 1870, repealed in 1960; see Article 1111, LSA-Code of Civil Procedure of 1960), as well as to recover damages due himself by reason of the breach of warranty (Article 385, Code of Practice). LSA-Civil Code Articles 2475, 2476, 2501; Planiol, Civil Law Treatise (LSLI Translation, 1959), Volume 2, Sections 1476, 1480, 1482.
Thus, when Leon accepted his father's succession after his father's death he also accepted his father Pierre's obligation under his warranty to make good Leon's obligation to restore the property to its true owners, the heirs of Irma Baudoin. As noted in the majority opinion, an obligation under the warranty is indivisible. See also Planiol, above-cited, Volume 2, Section 1484.
Therefore, the warranty of Pierre, the father-vendor, in the sale of 1908 had created two indivisible obligations: the obligation to Leon to make good the title to the property; and the contrary obligation to the Irma Baudoin heirs (via Pierre's warranty to Leon) to make good Leon's obligation to restore the property to these heirs as the true owners of it. Both Leon himself and the Irma Baudoin heirs unconditionally accepted Pierre's succession, which included the acceptance of Pierre's warranty containing both these contrary indivisible obligationswhich thus cancelled one another, and thus (because of this confusion of obligations, LSA-C.C. Art. 2217) left the co-heirs, on the one hand, and Leon, on the other, in the same position as they were before all of them had accepted the father Pierre's succession.
Stated another way, by accepting his father's succession unconditionally, Leon also accepted the unconditional obligation under the father's warranty of title to restore to the Irma Baudoin heirs the property in questionwhich thus estops Leon from now claiming title against these co-heirs. Therefore, as we correctly held in our opinion on the first hearing herein, because of this counter-estoppel binding Leon, the doctrine of "estoppel against estoppel" applies, so that Leon himself cannot urge that his co-heirs are themselves estopped from contending that their father did not have title to this property (which alleged estoppel of the co-heirs arises from the identical warranty by the father and from a similar acceptance by the co-heirs of the same father's succession).
For these reasons, I respectfully dissent from the denial of the present application for further rehearing.
HOOD, J., dissents for the reasons assigned in the original opinion and in the dissenting opinion of TATE, J.