SARTAIN, Judge.
These three consolidated concursus proceedings were instituted by Shell Oil Company and Pan American Petroleum, oil, gas and mineral lessees, to determine the right to funds derived from producing units located in the “H. H. Sand of the South Chauvin Field,” Terrebonne Parish, Louisiana. The rival claimants, as hereinafter noted, are designated as the Babin Heirs and the Hebert-Malbrough Heirs. From judgments in favor of the latter group, the Babin Heirs have appealed. We affirm.
The properties pertinent to this litigation are now known as Lots 4, 5, and 6 in Sections 25 and 26, Township 18 South, Range 18 East, Terrebonne Parish. These two sections front on the right descending bank of Bayou Little Calliou and widen to the rear to a depth of approximately 40 arpents. Lot 4 comprises the northern portion of Section 25 and the southern portion of Section 26. The Babins make no claim as to that portion of Lot 4 which is situated in Section 26 or to the south half of Section 25. Accordingly, what is at issue is title to the north (upper) half of Section 25 which includes a portion of Lot 4, all of Lot 5, and a portion of Lot 6.
In his written reasons for judgment, the judge a quo held that the Hebert-Mal-brough Heirs had proved their interests in the property by just title, 10 and 30 year prescription, and further that the Babins had lost any interests they might have had in the property by estoppel and 30-year liberative prescription.
The Babin Heirs base their claim on their interpretation of the acquisition and conveyance deeds of John Baptiste Babin, Sr. and John Baptiste Babin, Jr., hereinafter sometimes referred to as Babin, Sr. and Babin, Jr.
Section 25 was acquired by Babin, Sr. and Babin, Jr. from the government on October 24, 1835. The sale is evidenced by a receipt issued by the receiver of public moneys and, although the receipt refers to two tracts of land, it is clear that all of Section 25 was acquired.
On May 4, 1839, Babin, Sr. conveyed his interest in the property to Joseph Duplanti (Duplantis.)[1] by deed which in pertinent part stated:
“[A] certain tract of land being the undivided one half of the lot or Section 25 . the other half being the property of John Baptiste Babin fils . . . .” (Underscoring ours.)
Duplanti sold his interest to one Washington Whitney in 1841 and reacquired thé same from Whitney in 1843. In each of these instruments the property is described as “the undivided half of the lot or section No. Twenty Five.”
Joseph Duplanti conveyed his interest in the property to Antoine Domangue by an act of exchange dated January 1, 1845, wherein the property was again described as “being the undivided half of Section twenty-five.”
On March 19, 1845, Domangue conveyed to Martial Hebert property which was described in pertinent part as:
“[Bjounded above by the land of Thomas Allendon and below by that of J. Bt. Babin, Jr., being the undivided half of section No. twenty-five. . . . ”
On September 14, 1852, J. B. Babin, Jr. conveyed to Martial Hebert property in pertinent part described as:
“[LJower half of lot or Section No. 25 . being the same piece of land bought by his late father Jean Bte. Babin . who together bought the said number from the government of the United States, and the late J. Bte Babin, Sr. resold his share to Mr. Joseph Duplan-ti, Jr.”
It is the position of the present Babin Heirs that based on the above instruments Babin, Sr. and Babin, Jr. purchased Section *1342 25 in indivisión; that Babin, Sr. could and did only convey his undivided one-half interest therein to his original vendee (Joseph Duplanti); and, that since Babin, Jr. only conveyed his interest in the “lower half” of Section 25, that he (Babin, Jr.) remained the record owner of an undivided one-half interest in the “upper half” of Section 25, which they now claim as his lawful descendents.
The Hebert-Malbrough Heirs contend that by virtue of Martial Hebert’s acquisitions from Antoine Domangue (1845) and Babin, Jr. (1852), which are noted above, that he (Martial Hebert) became the record owner of the entirety of Section 25.
Martial Hebert continued to purchase additional lands in Section 24, immediately north of and adjacent to Section 25, and other acreage directly across Bayou Little Calliou from Section 25. Both Martial Hebert and his wife, Margaret Clark, died in 1896. On June 21, 1897, their surviving heirs entered into an authentic act of partition wherein all of the lands of Martial Hebert were divided into equal tracts and numbered 1 through 10. Tracts 4, 5 and 6 were deeded to George Hebert, Miss Louise Hebert, and Jean Baptiste Hebert respectively. These are the three tracts that are now in dispute and the Hebert-Malbrough Heirs are the descendents of the above named heirs of Martial and Margaret Clark Hebert. Attached to the partition is a schematic drawing of the ten tracts. These instruments were duly recorded on the same date in the Conveyance Records for Terrebonne Parish.
One of the instruments relied upon by the Hebert-Malbrough Heirs is a plat of survey and proces verbal dated June 23, 1839, signed by Jas. B. Grinage, a deputy survey- or, showing an equal division of Section 25 with the upper one-half marked “Joseph Duplantier” and the lower one-half marked “John Baptiste Babin.” The plat was not signed by either Babin or Duplantier and it was never recorded. The plat was among a group of old papers which has remained in the possession of the Hebert family for over a hundred years. Its significance was not known until the instant controversy arose (circa 1965). When the plat was first sought to be introduced, it was objected to by counsel for the Babin' Heirs on the grounds (1) of materiality in that it did not appear to represent a survey in the field; (2) that it could not constitute a partition between Duplantier and Babin, Jr. because it was not signed by either of them; (3) that Babin, Jr. was a minor at the time; and (4) that it did not comply with Louisiana’s ancient document statutes (R.S. 13:3727, et seq.). The trial judge sustained the objection. The plat itself and other evidence pertaining to it were then proffered under the provisions of C.C.P. art. 1636. The evidence included proof of its retention by the Heberts as noted above and the testimony of a handwriting expert which established that the signature thereon was in fact that of Jas. B. Grinage. He used as his basis of comparison other maps and surveys of record made and signed by Grinage, a deputy surveyor at the time. Whether the plat and proces verbal are admissible, their authenticity was clearly established under the evidence as proffered.
In his written reasons for judgment, the trial judge reversed his earlier decision and ruled that the proffered evidence was admissible. Pretermitting for the moment the probative value of this plat, we first address the issue of its admissibility.
On the question of materiality, the plat and proces verbal purport to effect an informal partition between Joseph Duplan-tier and John Baptiste Babin (Jr.) and an objection on that ground alone would not prevent its admission into evidence.
The absence of the signatures of Joseph Duplantier and John Baptiste Babin, Jr. and the minority of the latter at the time relate more to the weight to be accorded the instrument, i. e., its legal effect, and will be discussed in more detail later in this opinion.
The trial judge in admitting the proffered plat and proces verbal into evidence did not particularize his reasons for doing so. However, considerable attention is focused in the briefs of counsel as to the *1343 applicability of our ancient document statutes as set forth in R.S. 13:3727, et seq.
These statutes constitute a legislative adoption of the common law rule that documents which have been placed of record for a substantial number of years (generally 30) are admissible in evidence without further proof of execution. The rule is an exception to hearsay and is founded on the consideration that because of their age and the consequent difficulty, if not impossibility, of obtaining testimonial evidence from attesting witnesses and/or signatories thereto, their execution is presumed. 32A C.J.S. Evidence §§ 743-744; Comment, Best Evidence & Authentication, 21 Loy.L. Rev. 450, 460 (1975); Comment, Authentication, Identification, and the Best Evidence Rule, 36 La.L.Rev. 185 (1975).
The rule and now the statutes relating to the admissibility of an ancient document deal only with the authentication of the document sought to be offered in evidence and the burden of proof incidental thereto. They have nothing to do with nor do they change its basis for admission other than as to its genuineness. If the document otherwise satisfies the requirements of the statutes (rule), its genuineness is statutorily presumed, subject to rebuttal evidence to the contrary. Osborn v. Johnston, 322 So.2d 112 (La.1975); R.S. 13:3728, 13:3731.
In the instant case, the plat and accompanying proces verbal do not enjoy the presumption of genuineness as an ancient document under the statutes because they were never recorded. The statutes are not, however, exclusionary. Under the circumstances here presented, it was necessary that the proponents prove the document’s genuineness. As noted above, the authenticity of the signature of the surveyor, Jas. B. Grinage, was clearly established. It is also quite evident from the proffered evidence that the plat and process verbal are genuine and their admission into evidence cannot be denied on this ground.
The facts in the case of Broussard v. Guidry, 127 La. 708, 53 So. 964 (1911), relied upon by the Babin Heirs are clearly distinguishable from the facts in the instant case. In Broussard, one of the litigants sought to rely on an unrecorded plat which purported to evidence an agreement of exchange without offering further proof of authenticity. In the case at bar, there is ample proof of authenticity. We therefore find that the plat and proces verbal are admissible.
JUST TITLE AND ESTOPPEL
The dispute as to the ownership of the upper or north half of Section 25 arises from the descriptions contained in the early transactions, all of which are noted above, wherein the property acquired and sold was described as the “undivided one half” or the “undivided half” of Section 25, without further clarification as to whether it was an “undivided [one] half interest” in and to the whole of Section 25 or whether the parties were actually purchasing or conveying the “upper or north” or “lower or south” half of the section. This uncertainty in the descriptions of record was not put to rest until Babin, Jr. sold the “lower half" of Section 25 to Martial Hebert in 1852, as set forth above.
The trial judge in his written reasons for judgment held that it was the intention of Babin, Sr. when he acquired the section from the government that two tracts were purchased, the north or upper half of the section for himself and the south or lower half of the section for his son, Babin, Jr, His reason for so holding was based on his appreciation of the significance of the receipt issued by the receiver of public moneys, which refers to two tracts of land although all of Section 25 was receipted for, together with the subsequent sales of Ba-bin, Sr.’s successors in title, Babin, Jr.’s sale to Hebert, and the informal partition evidenced by the Grinage plat. The judge a quo felt that when all of the above are considered together they reflect a clear intention on the part of all parties that Section 25, beginning with the initial sale from the government in 1835, comprised two tracts, upper and lower. We agree.
As an additional basis for decision, we note that even if the patent from the *1344 government did not create two separate tracts, it is clear that subsequent actions established an upper and lower division of the section. When Babin, Sr. acquired the property in 1835 his son was six years of age. When the Grinage plat was made (1839) his son was ten years old and Babin Sr. had just conveyed his interest in the property to Duplanti(s). The proces verbal on the plat clearly indicates that the corners were marked and a division of the section was made with appropriate calls for the boundaries. It is obvious that Babin, Sr. had the survey made for the benefit of his young son and it is only then that the receipt from the government for “two tract of land” takes appropriate meaning. This brings us to the plat and its legal effect.
Although partitions, like all exchanges and conveyances of immovable property, must be in writing (Fox v. Succession of Broussard, 161 La. 949, 109 So. 773 (1926); Breaux v. Albert Hanson Lumber Co., 125 La. 421, 51 So. 444 (1910)), it has been recognized that under certain situations parties to unwritten partitions and their heirs and assigns will be bound by the agreement dividing the property.
In Chaumont Oil Co. v. LeBlanc, 185 La. 640, 170 So. 21 (1936), the plaintiff, who had acquired the north one-half of a tract under a deed purporting to convey full ownership, brought suit asserting an undivided one-half interest in the south half of the tract, which for twenty-five years had been claimed in full ownership and possessed by the defendant. Both the plaintiff and the defendant traced their title to a common author who owned the entire tract in full ownership. After the death of the common author, the property was owned in indivi-sión, one-half interest belonging to the defendant’s transferee and the other half to the plaintiff’s ancestor in title. The court found that these co-owners had entered into an informal partition of the tract, the defendant’s transferee taking the south half. The evidence proving this informal partition consisted of testimony that the dividing line between the two halves was marked by a turn row and other indicia of boundary and, more importantly, the acts of sale from the co-owners. Each act of sale purported to convey full ownership in half the tract and described the property sold as being bound by the land of the other co-owner. The Supreme Court held that since the plaintiff’s ancestor in title had participated in the informal partition, had sold in full ownership the half tract allotted him in that agreement, and had not later claimed an interest in the other half tract, the plaintiff was bound by the informal partition.[2]
In the similar case of Faulk v. Faulk, 180 So. 887 (La.App. 1st Cir. 1938), this court held that the heirs of a co-owner, who had participated in a verbal division of a tract held in indivisión, were estopped from denying that partition. There we stated:
“The co-owners not only made a definite and clear partition of the tract by verbal agreement, but they fully ratified it by their conduct and silence, and plaintiff’s father by authentic act accepted the part allotted to him by selling it, and recognized the ownership of the other part in his co-owner by designating him as owner of the tract which bound his tract on the west. The plea of estoppel herein filed by the defendants is well founded . ..” Faulk v. Faulk, supra at 889.
Pretermitting for the moment the minority status of Babin, Jr. at the time, we are satisfied that in the instant case there was an informal partition of Section 25 between Babin, Jr. and Duplanti(s). The survey made by Grinage in 1839 fixing the dividing line between the two tracts is persuasive evidence of the verbal agreement. Although it is true that the physical dividing line between the upper and lower halves of the section has not been discernible for some time, this in no way disproves the informal partition in the instant case, and, in fact, it supports the position of the He *1345 bert Heirs. This is so because Martial Hebert, who all concede was sole owner of the lower half of the section, would have had no reason to maintain the boundary if he also had full ownership of the upper half of the section. Significantly, Martial Hebert built his home in the middle of the north half. In view of his indisputable ownership of the south half, this would have been an irrational act unless he had good reason to believe he also had full ownership of the north half.
It is true that the three transfers of the north half subsequent to the Grinage survey (the sale by Duplanti(s) to Whitney (1841), the retrocession to Duplanti(s) (1843), the exchange between Duplanti(s) and Domangue (1845)) describe the land conveyed as “the undivided half of Section No. twenty-five.” However, the use of this description does not negate nor disprove the informal division since there is other strong evidence of the partition agreement. In the sale from Domangue to Hebert (1845), the parties inserted a description by boundaries, to-wit: “bounded above by the land of Thomas Alledon and below by that of J. Bte. Babin, Jr.” Additionally, and most significantly, in the 1852 sale from Babin, Jr. (who was then a major) to Martial Hebert the property is conveyed in full ownership and is specifically described as “the lower half of lot or Section No. 25.”
The affidavits of death and heirship offered by the Babin Heirs reflect that John (Jean) Baptiste Babin, Jr. died intestate “around 1890.” Thus, from 1852, the date of his sale of the lower half of the section to Martial Hebert, until the date of his death in 1890, a period of thirty-eight years, he made no effort to assert any interest or claim whatsoever to the upper half of the section which is now claimed by his heirs. The only possible inference is that Babin, Jr. knew of the informal partition, thought himself to be the owner of the lower half only, and acted accordingly. Although the purported partition was null,[3] it was not of the type that could not have been ratified by Babin, Jr.’s own silence and inaction. Jamison v. Smith, 35 La.Ann. 609 (1883).
Not only did Babin, Jr. fail to assert any claim to the property during the remaining thirty-eight years of his life, his heirs failed to take any kind of action during the next seventy-five years (1890-1965). As a matter of fact, the Babin Heirs were totally unaware of the identity of Jean Baptiste Babin, Jr. or any claim they might have as his descendants until they were approached by the mineral lessees. On the other hand, Martial Hebert and the Hebert-Marlbrough Heirs, who are the former’s direct descendants, have remained on and exercised ownership over these lands for a period in excess of one hundred thirteen years.
In Lafitte, Dufilho & Co. v. Godchaux, 35 La.Ann. 1161, 1163 (1883), the court stated:
“The genius of our law does not favor the claims of those who have long slept on their rights, and who, after years of inertia, . . suddenly wake up at the welcome vision of an unexpected advantage and invoke the aid of the courts for relief, under the effect of a newly discovered technical error in some ancient transaction or settlement."
This equitable concept is now well established in our jurisprudence. See, Succ. of Seals, 243 La. 1056, 150 So.2d 13 (1963); Ewald v. Hodges, 239 La. 883, 120 So.2d 465 (1960); Sun Oil Co. v. Roger, 239 La. 379, 118 So.2d 446 (1960); Valvoline Oil Co. v. Krauss, 335 So.2d 64 (La.App. 3d Cir. 1976); Daigre v. Cochrane, 287 So.2d 539 (La.App. 3d Cir. 1973); Allen v. Paggi Bros. Oil Co., 244 So.2d 116 (La.App. 3d Cir. 1971), writ refused 258 La. 247, 245 So.2d 716; Humble Oil & Refining Co. v. Boudoin, 154 So.2d 239 (La.App. 3d Cir. 1963); Shirey v. Campbell, 151 So.2d 557 (La.App. 2d Cir. 1963).
*1346 We cannot envision a stronger case of estoppel[4] and for the reasons noted above we agree with the trial judge and hold that the Hebert-Malbrough Heirs are vested with just title to their property.
PRESCRIPTION
Having preferred to rest our decision on the finding of just title and estoppel, for reasons stated above, it is not necessary that we discuss the alternative pleas of ten and thirty year acquisitive and thirty year liberative prescription filed by the Hebert-Malbrough Heirs.
ATTORNEYS’ FEES
Counsel for several of the absentee defendants have filed a joint motion in this court in which they ask that we increase the award set for their services in the trial court. In support of their claim they specify the additional number of hours expended by them in preparation of appellate briefs. We do not question the amount of hours spent in this endeavor. While the record does disclose the fractional interests these absentee defendants are entitled to, the record does not disclose the extent of the funds on deposit. It appears to us that the better procedure to follow under the present circumstances is to pretermit the fixing of additional fees at this time and to wait until the judgment is final. Then counsel may have the district court hear evidence, if necessary, and fix the fees along with all of the other costs involved. The right to do so is specifically reserved.
For the above reasons, the judgment of the district court is affirmed.
AFFIRMED.

. Various instruments refer to Duplanti also as Duplantis or Duplantier.

. Ten year acquisitive prescription was an additional basis of decision.

. C.C. art. 832, repealed in 1977, provided that “(t]he fixing [of] new boundaries, or the investigation of old ones, . . . must be done judicially” if one of the parties is a minor.

. The Hebert-Malbrough Heirs plead estoppel as a special defense. C.C.P. art. 1005.